895 F.2d 1441
 283 U.S.App.D.C. 19
 A/S IVARANS REDERI, Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
Companhia de Navegacao Lloyd Brasileiro, et al., Intervenors.
A/S IVARANS REDERI, Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
United States Lines (S.A.), Empresa Lineas Maritimas
Argentinas S.A., Companhia de Navegacao Lloyd
Brasileiro, Intervenors.
 Nos. 88-1597, 89-1105.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 12, 1990.
Decided Feb. 9, 1990.
As Amended March 12, 1990.
Rehearing Denied April 6, 1990.
 
 Elmer C. Maddy, with whom Walter H. Lion, New York City, was on the brief, for petitioner.
 Gordon M. Shaw, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Federal Maritime Com'n, was on the brief, for respondent Federal Maritime Com'n., Carol J. Neustadt, Atty., Federal Maritime Com'n, Washington, D.C., also entered an appearance for Federal Maritime Com'n.
 John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent U.S.
 Neal M. Mayer and Paul D. Coleman, for Empresa Lineas Maritimas Argentinas S.A. and Companhia de Navegacao Lloyd Brasileiro, et al., and John W. Angus, III, Washington, D.C., for U.S. Lines, S.A., were on the joint brief, for intervenors.
 Before SILBERMAN, BUCKLEY and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 A/S Ivarans Rederi ("Ivarans") is a Norwegian steamship line that operates freight vessels between the United States Atlantic and Gulf coasts, the Caribbean, and parts of South America. Ivarans petitions this court to review a decision by the Federal Maritime Commission, the agency responsible for regulating the waterborne foreign commerce of the United States, to dismiss Ivarans' complaint against the intervenors, who along with petitioner were parties to a revenue pooling agreement. Petitioner also challenges the FMC's refusal to grant a stay pending the outcome of related litigation in Brazil. Although the FMC properly heard the dispute, we conclude that the Commission unreasonably construed the language of the pooling agreement. We therefore grant the petition for review and reverse the FMC's dismissal of the complaint.
 
 I.
 
 2
 Between 1960 and 1970, instability existed in the trade between the United States and Brazil because of conflicting laws on the allocation among shipping companies of exports destined for the United States Atlantic coast. The FMC, acting pursuant to its statutory duty under the Shipping Act of 1916 to review agreements among ocean carriers filed with the Commission, see 46 U.S.C.App. Sec. 814 (1982),[1] rejected the then-existing government-imposed allocation of cargo, particularly since those rules discriminated against third-flag carriers.[2] In March 1970, the United States and Brazil agreed to permit all the carriers in the trade to negotiate a revenue pooling agreement for the northbound commerce to the United States, subject to the FMC's and Brazilian approval. Consequently, in 1972 the carriers in the trade[3] signed Agreement No. 10027, which assigned a 20% pool share to the three third-flag carriers in the northbound trade; the American and Brazilian national flag carriers were allocated the remaining 80% pool share.
 
 
 3
 Under Agreement No. 10027, a carrier exceeding its allotted pool share in a given year--by earning more revenues than the percentage of the trade assigned to it--was required to pay a pool penalty, to be distributed to the other pool members, consisting of a portion of the overcarrier's excess revenues. And Article 5(a) of that agreement specified a minimum number of sailings from Brazil to United States Atlantic ports that pool members must maintain in a calendar year:
 
 
 4
 National Flag Lines:
 Lloyd )
 Netumar ) 80 sailings
 Moore McCormack )
Non National Flag Lines:
 ELMA 12 sailings
 Ivarans 15 sailings
 Hopal 6 sailings
 
 
 5
 As is apparent, in 1972 the pooling agreement did not impose individual minimum sailing obligations for the three national flag carriers. Accompanying Agreement No. 10027, however, the national flag carriers negotiated a side contract, designated Agreement No. 10028, which divided their 80% revenue share and 80 minimum sailings requirement; the two Brazilian carriers, Lloyd and Netumar, took a 40% share and 40 sailings, and Moore McCormack, the sole American line, assumed the remainder. The FMC simultaneously approved both agreements.
 
 
 6
 In 1980, the carriers modified Agreement No. 10027 in several respects. Under the new version, approved and designated by the FMC as Agreement No. 10027-10 (the "Agreement"), the side contract between the national lines was incorporated into the main pooling agreement. In addition, the amended agreement reflected the addition of new carriers in the northbound trade. Under the modified Article 5(a), the minimum sailing requirements were delineated as follows:
 
 
 7
 National Flag Lines 80 sailings
 Brazilian Flag:
 Lloyd )
 Netumar ) 40 sailings
 United States Flag:
 Moore McCormack )
 Sea Land[4] ) 40 sailings
Non National Flag Lines 28 sailings
 ELMA )
 Bottacchi ) 12 sailings
 Ivarans ) 12 sailings
 Hopal ) 4 sailings
 
 
 8
 The revenue shares were similarly divided under a new Article 2:
 
 
 9
 National Flag Lines No Less Than 80 Percent
 Brazilian Flag:
 Lloyd )
 Netumar ) 40 percent
 United States Flag:
 Moore McCormack )
 Sea Land ) 40 percent
Non National Flag Lines No More Than 20 Percent
 ELMA )
 Bottacchi ) 9.25 percent
 Ivarans ) 9.25 percent
 Hopal ) 1.50 percent
 
 
 10
 Article 6 of both the old and new Agreements deals with the consequences of a party's or parties' failure to attain the minimum annual sailings. Under section 6(a), the pool share of a party which did not maintain the minimum sailing requirements would be reduced in proportion to the reduction in minimum sailings; this sum would be proportionately distributed to the other members of the same national or non-national flag category.[5] Section 6(e), however, provides for a more drastic remedy--suspension of the agreement--in certain situations:
 
 
 11
 In the event that any party or any combination of parties exceeding 1/3rd. of the total pool share for reasons of their own or in accordance with Article 11 [the force majeure provision] do not provide minimum number of sailings in accordance with Article 5 ..., the pool to be suspended for such duration and the pool to be resumed only when adequate service is again restored. (emphasis added)
 
 
 12
 In early 1982, Moore McCormack reduced the number of its sailings by drydocking three of its ships to modify them for expanded capacity. Consequently, in November 1982, Ivarans notified the other members of the Agreement that Moore McCormack was unlikely to maintain its required 40 minimum sailings for 1982. And, therefore, Ivarans considered revenue pooling suspended for 1982, pursuant to Article 6(e), since Moore McCormack represented more than a third of the revenue pool. Moore McCormack in fact made only 34 or 35 sailings in 1982.
 
 
 13
 After several unsuccessful attempts to negotiate the dispute, the other parties to the Agreement filed a notice of arbitration under Article 13's mandatory arbitration provision. A three-member arbitration panel then selected a Brazilian site for adjudication and declared that Brazilian law applied in interpreting the Agreement.[6] In a split decision, the panel majority in December 1985 concluded that suspension of the pool was not warranted under the circumstances. The majority viewed the language of Article 6(e) as ambiguous, and referring to Brazilian law, emphasized that the "object and purpose" of the Agreement must supersede the literal text. The tribunal decided that Ivarans must contribute nearly $1.5 million, which represents a portion of its excess revenue, in 1982 pool payments. But the majority also excluded Moore McCormack, now named United States Lines, from receiving any part of the award--rather than merely suffering a proportional reduction of its share--because the arbitrators felt that paying the carrier its pool share in light of its deliberate violation of the sailing requirements would constitute "unjust enrichment." Apparently, then, the arbitrators crafted a rough compromise between Article 6(a) and 6(e).
 
 
 14
 Following the unfavorable arbitration judgment, in March 1986 Ivarans filed a complaint with the FMC, alleging that the arbitration award and the other pool members" interpretation of the Agreement violated section 10(a)(2) and (3) of the Shipping Act of 1984, 46 U.S.C.App. Sec. 1709(a)(2)-(3) (Supp. V 1987), and section 32(c) of the Shipping Act of 1916, 46 U.S.C.App. Sec. 831(c) (Supp. V 1987), by implementing an agreement different from that approved by and filed with the Commission. United States Lines counterclaimed for the amounts owed under the pool agreement. In December 1986, an administrative law judge agreed with the arbitration majority that the pool should not be suspended because of United States Lines' failure to make its 40 sailings. In his view, Article 6(a)'s proportional reduction clause was the preferred remedy for violations of the sailing requirements. Applying this provision, the ALJ disagreed with the arbitrators' denial of any pool payments to United States Lines, and he granted United States Lines the right to receive its share of the 1982 pool payments, subject to a penalty in proportion to the reduction in required minimum sailings.
 
 
 15
 Meanwhile, a Brazilian appellate court in March 1987 vacated the arbitration award because the arbitrators had been improperly impanelled under Brazilian law. The other pool members then sought certiorari review in the Brazilian Supreme Court, which has yet to grant or deny the appeal. In April 1988, Ivarans filed its exceptions to the ALJ's decision with the FMC and also petitioned the Commission for a stay pending the outcome of the Brazilian litigation. The FMC adopted the ALJ's conclusions with some modifications, see 24 S.R.R. 1468 (1988), and rejected Ivarans' petition for a stay, see 24 S.R.R. 1029 (1988). Ivarans now petitions this court to review both decisions.
 
 II.
 
 16
 At the outset, we dispose of Ivarans' remarkable contention that the FMC lacked "jurisdiction" to hear its own complaint and that in any case its claims were moot. Petitioner argues that when the FMC approved the mandatory arbitration clause in Article 13, the Commission waived any right to review disputes arising from the pooling agreement. Ivarans frankly admits, as it must, that this view is a sharp about-face from the position it necessarily advanced when filing its complaint with the FMC. Second, Ivarans asserts that, even if the FMC did originally possess jurisdiction, when the Brazilian court vacated the arbitration award, the Commission could no longer hear the case because an arbitration award was a jurisdictional prerequisite. Finally, Ivarans contends the vacation of the award rendered the dispute with the intervenors moot. None of these arguments seems persuasive to us.
 
 
 17
 By characterizing the relationship between an arbitration award and the power of the FMC to review the dispute as a "jurisdictional" issue, both parties needlessly interject a confusing twist to the proper analysis. Private regulated parties cannot agree to waive the subject matter jurisdiction of the agency charged with the statutory responsibility to insure that parties implement agreements as approved by and filed with that agency. And just as assuredly, private parties may not agree to confer such powers on an arbitration panel. See Duke Power Co. v. FERC, 864 F.2d 823, 829 (D.C.Cir.1989); Swift & Co. v. FMC, 306 F.2d 277, 282 (D.C.Cir.1962). Section 10(a)(3) of the Shipping Act of 1984 prohibits any carrier from "operat[ing] under an agreement required to be filed ... except in accordance with the terms of the agreement or any modifications made by the Commission to the agreement." 46 U.S.C.App. Sec. 1709(a)(3) (Supp. V 1987). To enforce this prohibition, section 11(c) of the Act authorizes the "Commission, upon complaint or upon its own motion, [to] investigate any conduct or agreement that it believes may be in violation" of the Act. 46 U.S.C.App. Sec. 1710(c) (Supp. V 1987). Since Congress clearly envisioned a role for the FMC to play in investigating and adjudicating possible violations of the Shipping Acts, we think it rather extreme to conclude that the FMC "waived" its statutory obligations simply by approving an arbitration clause. Cf. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 227, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (noting that Congress may indicate its intent not to preclude judicial remedies in favor of arbitration by "an inherent conflict between arbitration and the statute's underlying purposes").
 
 
 18
 Rather than "jurisdiction," the issue before us more nearly resembles an application of exhaustion-like principles, since the parties, with FMC approval, have contractually arranged to have their disputes heard in the first instance by a private forum. See United States v. Western Pac. R.R., 352 U.S. 59, 63-64, 77 S.Ct. 161, 164-165, 1 L.Ed.2d 126 (1956). While the parties may not construct an obstacle to the FMC's right to enforce the Shipping Acts, the FMC may choose to approve the parties' desire to submit their claims to arbitration first. Mandatory arbitration clauses may reflect the parties' belief that arbitration effects a less costly, more timely, and perhaps more amicable resolution of disputes as compared to formal litigation in a public forum. The FMC, for its part, has apparently taken a consistent view that it will require parties to submit to arbitration when an approved contract has a mandatory arbitration provision.[7] See, e.g., Firestone Int'l Co. v. Far E. Conference, 9 F.M.C. 119, 128 (1965). But when the FMC requires exhaustion in an arbitration panel by approving a mandatory arbitration clause, the Commission always retains its statutory right to hear complaints that a filed agreement has been modified through an arbitration decision, in effect to review the arbitration award, even if under a deferential standard of review. See Swift & Co. v. FMC, 306 F.2d 277, 282 (1962). If it were otherwise, parties through arbitration could eviscerate the filing requirements that Congress considered necessary for the public interest.
 
 
 19
 Petitioner contends that recent Supreme Court decisions, particularly Rodriguez de Quijas v. Shearson/American Express, Inc., --- U.S. ----, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) and Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), oblige us to overrule our decision in Swift. We disagree. Rodriguez de Quijas and McMahon only held that mandatory arbitration clauses in a broker's standard agreement with customers are consistent with the securities laws and are enforceable, even though the provisions would preclude a resort to a judicial forum. Those cases did not address the situation in which the regulated parties must file the agreement with and obtain the approval of an agency charged with protecting the public interest. In Swift, we concluded that an arbitration decision resolving a dispute under the Shipping Act of 1916 "is not simply a private matter between two private litigants, but also has its public aspects," 306 F.2d at 282, since agreements among ocean carriers legally existed only by the Commission's approval. See id. at 281. The FMC thus retains the right and obligation to prevent modifications contrary to approved or filed terms. We recently reaffirmed this important distinction in Duke Power Co. v. FERC, 864 F.2d 823 (D.C.Cir.1989), decided after McMahon, when we emphasized that the Federal Energy Regulatory Commission's "independent regulatory duty to remedy a utility's violation of its filed rate schedule" empowers it to resolve "disputes at the core of its enforcement mission" despite the presence of an arbitration clause. Id. at 829.
 
 
 20
 Nor do we see any merit at all in Ivarans' argument that the case has been mooted (or that the FMC has lost jurisdiction) because of the Brazilian court's vacation of the arbitration award. It could hardly be suggested that there is not a continuing controversy between the parties to the agreement (and the FMC) as to its proper interpretation. See Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950-51, 23 L.Ed.2d 491 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."). Ivarans" mootness argument is really a variation of its jurisdictional argument except that, as presented, it seems implicitly to concede that the proper analysis is one of exhaustion. In effect, Ivarans is claiming that the FMC should wait until the arbitrators' award is final before considering the issue Ivarans brought to the FMC. Under the circumstances, we do not think the FMC was so obliged. After all, the parties, by going to arbitration, discharged their contractual obligation, and whether or not the arbitration panel was properly formed in accordance with Brazilian law, the FMC now has before it the benefit of the arbitrators' interpretation. Furthermore, since Ivarans brought the case to the FMC, asserting the Commission's jurisdiction wholly independent of the arbitrators' award, we do not think the FMC was compelled to permit Ivarans to switch its position because of the Brazilian court's intervention.[8]
 
 III.
 
 21
 We turn now to petitioner's contention that the FMC misconstrued the Agreement to permit the continued operation of the revenue pool despite United States Lines' failure to conduct its minimum sailings in 1982. Our review of the Commission's reading of the Agreement is limited in scope, since the agency's interpretation of contracts filed with it is entitled to deference. See National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1569 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Here, Congress specifically authorized the FMC to review, approve, and police agreements among ocean common carriers. This delegation of authority by Congress, coupled with the FMC's technical knowledge of the subject matter, cautions us to accord great weight to the agency's judgment. See id. at 1569-70. Nonetheless, our review of the FMC's decision is not toothless, because "if the intent of the parties on the particular issues is clearly expressed in the document, 'that is the end of the matter.' " Id. at 1572 (quoting Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)).
 
 
 22
 Article 6(e), on its face, seems quite clearly to provide that United States Lines' completion of only 34 or 35 sailings in 1982 requires the suspension of the revenue pool for the year. That provision triggers suspension if "any party or combinations of parties exceeding 1/3rd of the pool share ... do not provide minimum number of sailings." Both conditions were satisfied: United States Lines, after being assigned Sea-Land's pool share and sailing obligations, indisputably held 40% of the revenue pool and needed to undertake 40 sailings to satisfy its sailing obligation.
 
 
 23
 The FMC, however, determined that Article 6(e) when combined with Article 6(a) creates an ambiguity. According to the Commission, Article 6(a), which only provides for a reduction in pool payments, could also apply to United States Lines' failure to conduct 40 sailings since that provision simply refers to "a party ... fail[ing] to maintain the minimum number of sailings." The only explicit exception mentioned in Article 6(a) is the Article 11 force majeure provision, which is not relevant here; therefore, the FMC concluded, Article 6(a) appears to apply as well as 6(e) even when a party with 33% of the pool violates the minimum sailing requirements, thus creating an ambiguity as to which section governs.
 
 
 24
 To resolve the ambiguity it discovered, the FMC explained that the phrase "any party or combination of parties" in Article 6(e) must be limited to mean only "the national flag lines as a group." Since the national flag lines completed a total of 108 sailings in 1982, in excess of the required 80 sailings, Article 6(e) did not, therefore, apply. The Commission supported this construction by looking to the history of the pooling agreement. Because the original 1972 version of the Agreement did not specify individual requirements for the national flag carriers (although the side agreement did), the suspension provision at that time could not have applied to the deficiency of any single national flag carrier. When the parties amended the pooling agreement in 1980 and divided the 80 sailings into individual carrier obligations, the FMC contends that Article 6(e) was left unchanged, the FMC assumes, as an oversight. To support its position, the FMC outlined eight adverse consequences stemming from petitioner's interpretation of the Agreement.[9]
 
 
 25
 The FMC's creative interpretation of Article 6(e) does not appear to us to be a permissible construction of the language of the Agreement, and thus we reject it as unreasonable. Even prior to the 1980 amendments, when the pooling agreement did not specify the individual sailing obligations of national flag carriers, the FMC's view might not have been a plausible one because the side agreement filed at the same time had allocated the minimum sailing obligations among the three national flag carriers. But the FMC's construction of the present Agreement must either ignore the specific wording of the contract or read in entire phrases to accomplish the Commission's preferred outcome. Under its interpretation of Article 6(e), the 33% pool share threshold for suspension is made nonsensical, because the national flag lines as a group have always retained 80% of the revenue pool. The FMC has offered no explanation as to why the drafters chose the 33% figure rather than 75 or 80%--or why the drafters selected a numerical cutoff at all rather than using the words "national flag lines." Second, to diminish the applicability of Article 6(e), the FMC artificially amends the language "any party or combination of parties" to in effect add the phrase "that constitutes the national flag carriers as a whole." Yet Article 19, which identifies the "parties" executing the Agreement, lists each carrier in the trade separately instead of grouping the national flag carriers together as a single party. Unquestionably then, the Agreement itself defines a "party" as meaning an individual ocean carrier.
 
 
 26
 In short, we do not perceive an ambiguity. Articles 6(a) and (e) may easily be read together without the FMC's "redrafting" of the suspension clause. Under the most natural, and indeed the only plausible, interpretation of these two sections, Article 6(a) spells out the general rule of proportional reduction in pool payments short of severe disruptions in the minimum sailing requirements, and 6(e) describes the more serious situation in which a party or parties representing 33% of the pool fails to meet the sailing obligations. Those provisions are complementary, not in conflict. Article 6(e) apparently reflects the parties' concern that if a large share-owner or a significant group is not fulfilling the minimum sailing requirements, then it may no longer be equitable to continue to pool revenues at all. Whereas for only minor deviations in the trade, Article 6(a) prescribes a less drastic remedy.
 
 
 27
 Since the pooling agreement reflects not only the intent of the private parties but of the agency that approved it, we must be mindful of the FMC's understanding in 1980 (to the extent it can be discerned), when the Commission accepted the present version of the agreement. See Swift & Co. v. FMC, 306 F.2d 277, 281 (D.C.Cir.1962). Although the FMC did not extensively discuss the 1980 amendments, the comments it did make strengthen our reading of the Agreement. In approving the amendments, the FMC emphasized "the guarantee of service through minimum sailing requirements." Order, Conditional Approval of Agreement No. 10027-10 (Dec. 30, 1980) at 4. The Commission, moreover, reminded the parties that "[t]he minimum sailing/calls requirement bears heavily on the regularity of service and any change should be approved by the governmental authorities." Id. at 5. Thus, the Commission regarded the sailing obligations, and the amendments delineating each ocean carrier's individual responsibility, as essential to its acceptance of the new agreement. This suggests that the FMC understood and approved the severe suspension remedy for the sailing deficiencies of a major party. But perhaps the best indicator we possess of the FMC's understanding in 1980 is the text of the Agreement itself. The Commission thoroughly analyzed the proposed Agreement, requiring modifications in some provisions and leaving others intact. That the FMC chose to leave unchanged the suspension language of Article 6(e) also suggests to us that the Commission approved suspension in these circumstances.
 
 
 28
 The sailing requirements were also undoubtedly important to the parties themselves in order to prevent some carriers from exploiting the pool payments of others. Not surprisingly, the parties agreed to harsh consequences in the event a large party failed to live up to its obligations. Rather than undermine our reading of the Agreement, the severity of these penalties only indicates to us the premium the parties placed on their mutual performance.[10]
 
 IV.
 
 29
 We conclude that the FMC properly asserted its right to hear what was a live dispute between Ivarans and the intervenors. But since we also decide that the FMC's reading of the Agreement was unreasonable because it conflicted with the clear language of the contract, we grant the petition for review and reverse the judgment against petitioner.
 
 
 30
 It is so ordered.
 
 
 
 [1]
 Under the Shipping Act of 1984, the FMC no longer approves agreements among ocean carriers, but such agreements must still be filed with the Commission and may be implemented only in accordance with the filed terms. See 46 U.S.C.App. Secs. 1704(a), 1709(a)(2)-(3) (Supp. V 1987)
 
 
 [2]
 A "third-flag" or "non-national" carrier is a shipping company with beneficial ownership outside of the two countries between which the cargo is being transported. Thus, Ivarans, as a Norwegian company, is a third-flag carrier since it operates vessels shipping cargo between Brazil and the United States. In contrast, a "national flag carrier" refers to a company operating ships between its home country and another
 
 
 [3]
 The original parties to Agreement No. 10027 and their nationalities were: Companhia de Navegacao Lloyd Brasileiro ("Lloyd") (Brazilian); Companhia de Navegacao Maritime Netumar ("Netumar") (Brazilian); Empresa Lineas Maritimas Argentinas S.A. ("ELMA") (Argentine); Van Nievelt Goudriaan and Co., B.V. ("Hopal") (Dutch); Moore McCormack Lines, Inc. ("Moore McCormack") (United States); and Ivarans
 
 
 [4]
 Article 2(f) of Agreement No. 10027-10 assigned all of Sea-Land's "rights, responsibilities and obligations under this agreement" to Moore McCormack. Thus, Sea-Land is only a nominal party to the agreement--both its revenue share and its sailing responsibilities were transferred to Moore McCormack
 
 
 [5]
 Article 6(a) of the 1980 Agreement reads:
 In the event that a party shall fail to maintain the minimum number of sailings per pool period as specified in Article 5-a hereof, with the exception provided in Article 11, then the pool share of such a party shall, for the applicable accounting period, be reduced in direct proportion to the reduction in minimum sailings and the share of the other party(ies), within the National Flag or the Non-National Flag category, where the deficiency occurs, shall be increased by the same amount, proportionally to their respective shares.
 
 
 [6]
 No one argues that we should apply Brazilian law to interpret the agreement, and therefore we decide the case based on United States administrative law
 
 
 [7]
 The FMC nevertheless argues that it has discretion to skip the initial arbitration step and hear disputes immediately. But under the Shipping Act of 1916, which authorized the FMC to approve filed agreements, it seems to us that the FMC must have taken that position at the time it approved the agreement to insure that power. Under the new regime of the 1984 Shipping Act, the FMC's obligation is less clear, since the Commission no longer approves agreements
 
 
 [8]
 We do not suggest that the FMC would be free in all circumstances to act prior to a final arbitration award. The situation facing us might be entirely different if a party other than Ivarans, which invoked the authority of the FMC, argued that in the absence of a valid arbitration award, the FMC was required to stay its hand. See Duke Power Co. v. FERC, 864 F.2d 823, 831 (D.C.Cir.1989) ("we do not give the Commission a license to disregard mandatory arbitration clauses in routine contract disputes"); Swift & Co. v. FMC, 306 F.2d 277, 282 (D.C.Cir.1962)
 
 
 [9]
 Among the eight consequences the ALJ noted were: (1) the entire pool would be suspended even if United States Lines had conducted 39 rather than 40 sailings, (2) Ivarans' interpretation ignores the performance of other carriers in the pool, who in 1982 made far more sailings than the Article 5 requirements, and (3) the pool would be suspended for all of 1982 even though Ivarans noticed the deficiency only in October 1982
 
 
 [10]
 The FMC contends that this reading of Article 6(e) would ignore the language that reinstates the pool "only when adequate service is again restored." The Commission claims that this phrase means that the pool may not be suspended in the first place if service is "adequate." Since the national flag carriers as a group exceeded the 80 minimum sailings, the FMC believes that suspension was not warranted. This interpretation, however, would give a strained meaning to the words "only" and "again" in the text. The "only" indicates that "adequate service"--whatever that might mean--is the exclusive test for the resumption of the pool. But if "adequate service" meant anything other than one party or combination with 33% pool share not meeting their minimum sailings, it would render the rest of Article 6(e) meaningless. Moreover, the word "again" indicates that adequate service is referring back to minimum sailings, which returns us to the question of who must perform such minimum sailings