938 F.2d 1365
 1992 A.M.C. 292, 291 U.S.App.D.C. 106
 A/S IVARANS REDERI, Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
American Transport Lines, Inc., United States Lines, Inc.,
and United States Lines (S.A.), Inc.
Reorganization Trust, Intervenors.
 No. 90-1169.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 11, 1991.
Decided July 16, 1991.
Rehearing and Rehearing En Banc
Denied Sept. 25, 1991.
 
 Elmer C. Maddy, with whom Walter H. Lion was on the brief, New York City, for petitioner.
 Gordon M. Shaw, Atty., Federal Maritime Com'n, for respondents. With him on the brief were James F. Rill, Asst. Atty. Gen., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, and Robert D. Bourgoin, Gen. Counsel, Federal Maritime Com'n, Washington, D.C.
 William H. Fort for American Transport Lines, Inc. for intervenors. With him on the joint brief were John A. DeVierno and John W. Angus, III, Washington, D.C. for U.S. Lines, Inc. and U.S. Lines (S.A.), Inc. Reorganization Trust.
 Before EDWARDS, CLARENCE THOMAS and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge CLARENCE THOMAS.
 CLARENCE THOMAS, Circuit Judge:
 
 
 1
 We revisit in this case the Atlantic Agreement, one of the contracts that govern the shipment of goods between the United States and Brazil. In A/S Ivarans Rederi v. United States (Ivarans I), 895 F.2d 1441 (D.C.Cir.1990), we held that the Federal Maritime Commission had the authority to review after arbitration a dispute between the parties to the agreement but that the Commission had incorrectly found ambiguous some of the contract's plain language. We decide here that the Commission has the authority to skip over the arbitration step in the agreement and that the Commission reasonably interpreted language in the agreement that it correctly found ambiguous.
 
 I.
 
 2
 Brazilian and American officials signed a "Memorandum of Consultation" in 1970, leading carriers in turn to sign contracts in 1972 and the Federal Maritime Commission and the Superintendencia Nacional da Martin Mercante to approve them the following year. In two of the contracts, one called the Gulf Agreement and the other the Atlantic Agreement, the carriers in the trade agreed to pool revenue from goods shipped north, from Brazil to the United States. American Transport Lines, Inc. (AmTrans), a shipper flying the American flag and successor to the bankrupt United States Lines (S.A.), Inc. (which itself bought out two of the contracts' original parties), is currently a party to both the Atlantic and the Gulf Agreements. A/S Ivarans Rederi, a shipper flying the Norwegian flag, never belonged to the Gulf Agreement but did belong (until it resigned in 1989) to the Atlantic Agreement.
 
 
 3
 Until 1985, all goods subject to both agreements went from Brazilian ports to American ports directly by water. That year, the Brazilian government repealed its prohibitions against intermodal service, in which goods are first sent by ship and then by truck or rail, with the carrier bearing both expense and responsibility. United States Lines responded with "alternate coast port" service, an intermodal service in which it discharged goods at Atlantic ports and then brought them overland to the Gulf ports shown in the bills of lading. In 1986, the parties to the Gulf Agreement amended it to state expressly that that contract included alternate coast port cargo. Parties to the contracts governing southbound trade between the United States and Brazil and between the United States and Argentina similarly amended those parallel pooling agreements, to include alternate coast port cargo in the Gulf contracts and to exclude it from the Atlantic contracts. Ivarans and its cosignatories began negotiating changes to the Atlantic Agreement. None of the parties would budge, however, so the Atlantic Agreement remained unchanged in relevant parts.
 
 
 4
 Ivarans argued that no matter the scope of the Gulf Agreement, the Atlantic Agreement covered alternate coast port cargo as well. (Other disputes over the Atlantic Agreement had led to Ivarans I, which wended its way through the agency and this court at about the same time.) Concerned about overlapping responsibilities deriving from the two pooling contracts, United States Lines, joined by AmTrans, its successor in interest, asked the Commission for a declaratory order concerning their rights and responsibilities under the Atlantic Agreement. United States Lines and AmTrans argued that the Atlantic Agreement did not cover alternate coast port cargo. Ivarans argued that it did and that in any case United States Lines and AmTrans should have filed their claim in arbitration. The Commission decided that the issue was appropriate for resolution by the agency, not an arbitration board, but that the parties would benefit from the initial attention of an administrative law judge. United States Lines (S.A.) Inc., 24 Shipping Reg. (P & F) 1034 (Comm'n June 22, 1988) (Petition for Declaratory Order re: The Brazil Agreements). The administrative law judge then ruled in favor of United States Lines and AmTrans, 25 Shipping Reg. (P & F) 1 (A.L.J. Apr. 14, 1989), and the Commission affirmed with minor modifications, 25 Shipping Reg. (P & F) 755 (Comm'n Feb. 9, 1990). Ivarans now petitions this court for review of the Commission's order.
 
 II.
 
 5
 Article 21(a) (originally article 13(a)) of the Atlantic Agreement governs "Arbitration":
 
 
 6
 Any and all differences and disputes of whatsoever nature as arising out of the Pooling Agreement which cannot be resolved by signators of this Agreement ..., shall be placed in arbitration....
 
 
 7
 In Ivarans I, Ivarans argued that this clause divested the Commission of jurisdiction to hear disputes between the parties and instead conferred that authority on an arbitration panel. Reaffirming Swift & Co. v. FMC, 306 F.2d 277 (D.C.Cir.1962), we rejected Ivarans's argument. In approving contractual arbitration clauses, the Commission gives effect to the intentions of private parties. But because a shipping contract owes its legal existence to the statute under which the contract was filed, see Swift, 306 F.2d at 282, the Commission "always retains its statutory right to hear complaints that a filed agreement has been modified through an arbitration decision," Ivarans I, 895 F.2d at 1446 (emphasis deleted).
 
 
 8
 In this case, Ivarans takes a slightly different tack. Although the Commission may, in the end, resolve a dispute between the parties, in Ivarans's view the Commission must wait until the parties have gone through arbitration before doing so. The Commission maintains that it need stay its hand only when the parties' dispute involves the application of the contract to particular facts. If the dispute involves the interpretation of language in the contract itself, the Commission argues, the agency retains the discretion to resolve the dispute in the first instance.
 
 
 9
 Duke Power Co. v. FERC, 864 F.2d 823 (D.C.Cir.1989), addressed the same argument. We first held in that case that mandatory arbitration clauses do not divest the Federal Energy Regulatory Commission of jurisdiction over contract disputes (thus reaching the same result that we later reached in Ivarans I with respect to the FMC), since the enforcement of rate schedules filed with the agency is "a matter distinctly within the Commission's statutory mandate," id. at 829. We also noted that FERC bears the responsibility, derived from statute, to protect the public interest by enforcing filed rate schedules, and that this responsibility gives the agency "an independent interest as a regulatory body" in resolving contract disputes. Id. at 831. Accordingly, we held, when parties dispute the meaning of the terms in a schedule and thereby implicate the agency's public duties, the agency can decide, in its judgment, whether to send the parties first to arbitration. See id. at 830-31.
 
 
 10
 The Federal Energy Regulatory Commission and the Federal Maritime Commission bear obvious family resemblances. The Shipping Act of 1984 requires that all pooling agreements be filed with the agency and that parties to the agreements operate under them only "in accordance with [their] terms." 46 U.S.C. app. Secs. 1704(a), 1709(a)(3). This case thus implicates the FMC's enforcement authority. Moreover, this case does not involve only private parties. In determining the proper construction of pooling agreements, the FMC inevitably touches commercial relationships among many others in the shipping industry. See, e.g., id. app. Sec. 1709(c)(3) ("No conference or group of two or more common carriers may ... engage in any predatory practice designed to eliminate the participation, or deny the entry, in a particular trade of a common carrier not a member of the conference, a group of common carriers, an ocean tramp, or a bulk carrier."). It is therefore appropriate that the FMC, like FERC, be allowed to consider disputes such as this one in the first instance, without having to send the case to arbitration.
 
 
 11
 The Commission also provided here a rational explanation for its deferment policy: It will decide a dispute without forcing the parties to resort to arbitration, on among other occasions, when the dispute involves purely legal questions, not factual ones, and when arbitration would be a waste of time. See generally United States Lines, 24 Shipping Reg. at 1039-42; Possible Breach of Pacific Coast European Conference Rate Agreement, 17 F.M.C. 205, 211-12 (Comm'n 1973), aff'd, 537 F.2d 333 (9th Cir.1976). Cf. Port Auth. of New York & New Jersey v. New York Shipping Ass'n, 22 Shipping Reg. (P & F) 1329, 1343-44 (A.L.J. Nov. 9, 1984), aff'd, 23 Shipping Reg. (P & F) 21 (Comm'n Feb. 27, 1985). This court has previously approved the method by which the Interstate Commerce Commission defers questions to arbitration. See International Bhd. of Elec. Workers v. ICC, 862 F.2d 330, 335-40 (D.C.Cir.1988). We similarly approve the FMC's deferment policy in this case.
 
 III.
 
 12
 Article 4(a) (originally article 1(a)) of the Atlantic Agreement governs the "Scope of the Agreement":
 
 
 13
 This Agreement covers the apportioning of freight revenue among the parties resulting from the freighting operations on all cargo that they carry as hereinafter described, transported by the parties northbound, ... from the ports of Brazil, within the Port Alegre/Rio Grande-Recife range, both inclusive, to any port on the Atlantic Coast of the United States.
 
 
 14
 Article 11(a) (originally article 3(a)) defines "Cargo Subject to the Pool":
 
 
 15
 It is agreed that all cargo, shipped from ports of the Coast of Brazil and destined to Atlantic ports of the United States of America, as established in Article 4, shall be subject to this pool....
 
 
 16
 Ivarans argues that the agreement covers alternate coast cargo, since article 4(a) refers to "all cargo"--without qualification--"transported ... from the ports of Brazil, ... to any port on the Atlantic Coast of the United States." Read alone, article 4(a) supports Ivarans's position; cargo shipped from Recife to Savannah, then discharged and shipped to Biloxi, still goes "from" a port of Brazil "to" a port on the Atlantic, even though it eventually ends up on the Gulf. Article 4(a), however, explicitly refers to "all cargo as hereinafter described," and "hereinafter described" could mean described hereinafter in article 4(a), or described hereinafter elsewhere in the contract. Article 11(a) of the contract also describes the cargo, and it limits the agreement's coverage to "all cargo, shipped from ports of the Coast of Brazil and destined to Atlantic ports of the United States of America" (emphasis added). It seems to us that cargo that ends up in Biloxi but goes through Savannah on its way from Recife is "destined to" (or for) Biloxi, not Savannah, given, at least, the ordinary meaning of the word "destined." See Black's Law Dictionary 403 (5th ed. 1979); Webster's Third New Int'l Dictionary 615 (unabridged ed. 1981); cf. United States v. Barker, 24 F.Cas. 985, 986 (C.C.D.Mass.1829) (No. 14,516) (Story, Circuit Justice) (" 'Port of destination' and 'port of discharge' are not equivalent phrases.").
 
 
 17
 Articles 4 and 11 together reveal that the agreement is at least silent, and perhaps internally inconsistent, with respect to the question of alternate coast cargo. This is where our job ends and the agency's begins. Once we determine that a filed contract is silent or ambiguous on a particular question, we must defer to the agency's reasonable construction of the contract's terms. See National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1568-73 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Ivarans exhibits some unhappiness with this principle, but we see little point in addressing the substance of its critique: National Fuel Gas has permeated the law of this circuit. See, e.g., Cajun Elec. Power Coop., Inc. v. FERC, 924 F.2d 1132, 1135-37 (D.C.Cir.1991); Transcontinental Gas Pipe Line Corp. v. FERC, 922 F.2d 865, 869-70 (D.C.Cir.1991); Ivarans I, 895 F.2d at 1447-49.
 
 
 18
 In any event, the Commission here found that the Atlantic Agreement was ambiguous with respect to alternate coast cargo. As we have explained, we think that that reading was accurate. The question, then, is whether the Commission's interpretation of the contract was reasonable. The answer, we think, is that it was.
 
 
 19
 The Commission noted in its opinion that filed agreements are exempt from the antitrust laws. See United States Lines, 25 Shipping Reg. at 764; 46 U.S.C. app. Sec. 1706(a)(1), (2); cf. id. app. Sec. 1705(g), (h). As a result, the Commission explained that while it requires no contractual shibboleth, it does demand clear and specific authority--either in the contract or outside it--to ensure that the agreement covers the anticompetitive activity. See 25 Shipping Reg. at 764. Finding that the Atlantic Agreement itself lacks any language that was either clear or specific, the Commission examined the available extrinsic evidence. None of the evidence, however--practices in the trade, for example, or contemporaneous discussions by the parties--showed any objective intent to cover alternate coast cargo. The Commission thus decided that the contract does not cover it.
 
 
 20
 That interpretation was reasonable. In reaching it, the Commission employed the rule of construction that we have just described: The contract must clearly and specifically identify the particular anticompetitive activity in which a party seeks to engage. See Intermodal Serv. to Portland, Oregon, 17 F.M.C. 106, 118 (Comm'n 1973); see also Disposition of Container Marine Lines, 11 F.M.C. 476, 485-92 (Comm'n 1968); cf. 46 C.F.R. Sec. 572.103(g) ("An agreement filed under the [Shipping] Act must be clear and definite in its terms, [and] must embody the complete understanding of the parties...."). As articles 4 and 11 reveal, the Atlantic Agreement does not contain clear and specific language authorizing alternate coast port service as part of a pooling agreement, a course of conduct that is quintessentially anticompetitive. There was also substantial evidence supporting the Commission's determination that there existed no extra-contractual authority for including alternate coast port cargo in the contract. Although Ivarans's Managing Owner, Erik Holter-Sorensen, may have thought otherwise, he never told anyone so at the time the contract was drafted, and no one, so far as we can tell, shared Holter-Sorensen's belief. Finally, the Commission's construction makes commercial sense. The Atlantic and Gulf Agreements were drafted together and had never overlapped before. The Commission wisely decided on a construction that would preserve commercial expectations by preserving the agreements' symmetry.
 
 IV.
 
 21
 We hold that the Commission properly decided to resolve this dispute without first sending the parties to arbitration and that the Commission reasonably construed ambiguous contractual language. We have considered Ivarans's other arguments and find them lacking in merit. For the foregoing reasons, the petition for review is
 
 
 22
 Denied.