UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARYLAND PORT ADMINISTRATION,
Petitioner,

v.

FEDERAL MARITIME COMMISSION;

No. 97-2418

UNITED STATES OF AMERICA,
Respondents.

CERES MARINE TERMINALS,
INCORPORATED,
Intervenor.

On Petition for Review of an Order
of the Federal Maritime Commission.
(94-1)

Argued: April 8, 1998

Decided: October 13, 1998

Before ERVIN and HAMILTON, Circuit Judges, and
OSTEEN, United States District Judge for the
Middle District of North Carolina,
sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished opin-
ion. Judge Ervin wrote the opinion, in which Judge Hamilton and
Judge Osteen joined.

_____

**COUNSEL**

**ARGUED:** Eugene D. Gulland, COVINGTON & BURLING, Wash-
ington, D.C., for Petitioner. Carol Judith Neustadt, FEDERAL MARI-

TIME COMMISSION, Washington, D.C., for Respondents. Robert T. Basseches, SHEA & GARDNER, Washington, D.C., for Intervenor. **ON BRIEF:** David W. Addis, Michael L. Rosenthal, COVINGTON & BURLING, Washington, D.C.; J. Joseph Curran, Jr., Attorney General of Maryland, M. Catherine Orleman, Assistant Attorney General, Deborah M. Levine, Assistant Attorney General, MARYLAND PORT COMMISSION, Baltimore, Maryland, for Petitioner. Thomas Panebianco, General Counsel, Amy W. Larson, FEDERAL MARITIME COMMISSION, Washington, D.C., for Respondents. David B. Cook, SHEA & GARDNER, Washington, D.C., for Intervenor.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

ERVIN, Circuit Judge:

This case involves an appeal by the Maryland Port Administration ("MPA") from a Federal Maritime Commission ("FMC") decision in which the FMC found that the MPA had discriminated against Ceres Marine Terminals, Inc. ("Ceres"), a marine terminal operator in Baltimore. The MPA and Maersk Shipping, Ltd. ("Maersk") had negotiated a lease in which the MPA granted Maersk preferential rates for the use of Baltimore port facilities in order to persuade Maersk to maintain its presence in Baltimore Harbor and route a certain number of ships per year to Baltimore. The FMC held that Ceres, which had guaranteed to move a certain number of containers through the port, effectively guaranteed the same volume of ship traffic through Baltimore and thus was entitled to the preferential rate offered to Maersk. The FMC also determined that the containers Ceres moved by means of its barge service should count towards satisfying the minimum container guarantee Ceres had given the MPA.

On appeal, the MPA claims (1) the FMC erred in failing to address the MPA's claim that Ceres was barred by the theories of waiver and

estoppel from bringing suit on its lease; (2) the FMC erred in finding that the MPA had no valid reason for offering different rates to Maersk and Ceres in their respective leases, and in any event incorrectly calculated any damages owed; (3) the FMC unjustly applied new standards of liability retroactively; (4) the FMC incorrectly interpreted Ceres's barge lease to permit barged cargo to satisfy Ceres's overall cargo guarantee.

I.

Maersk Shipping is a Danish company that has been doing business in the Port of Baltimore for over 60 years. The Maryland Port Administration is a Maryland state agency and is charged with administering the state's ports. Baltimore faces increasing competition from other East Coast ports in Virginia that are located farther down the Chesapeake Bay and are less expensive to reach from the open sea. Maersk transferred a good share of its business from Baltimore to Virginia, and threatened to transfer more. To counteract this threat, the MPA offered Maersk extremely favorable terms for the use of Baltimore port facilities.

In November, 1991, the MPA and Maersk executed a lease agreement providing Maersk with 36 acres for the purposes of berthing, loading or unloading vessels, storing containers or cargo, and repairing or servicing containers or other equipment. Maersk agreed to move at least 30,000 containers through the leased premises and to make a minimum of 52 direct vessel calls (excluding barges) during each year of the lease. The lease included a penalty should Maersk fail to meet the minimum cargo requirements.

Universal Maritime Services Corporation is a marine terminal operator (MTO), whose business involves providing marine terminal and stevedoring services to shippers. Universal provides MTO services to Maersk at a facility separate from that which Maersk leases directly from the MPA, and also provides MTO services to shippers besides Maersk. Universal also entered into a lease agreement with the MPA in November, 1991, under which it has 39 acres of space for providing its services. Universal agreed to move 11,000 containers per year for the first five years of the lease, with that amount increas-

ing to 15,000 containers during the second five years of the lease. Universal's container guarantee is distinct from that given by Maersk.

Ceres entered into a five-year lease agreement for 88.61 acres in May, 1992. Ceres guaranteed that it would handle a minimum of 70,000 loaded containers in each year of the lease, with some non-containerized cargo counting toward the minimum. The terms of the Ceres lease agreement are considerably less favorable than those of the Maersk agreement, though they are better than the terms of Universal's agreement due to a volume discount for the large number of containers moved by Ceres.

Ceres knew of Maersk's agreement at the time of its negotiations with the MPA and argued for similar terms. The MPA refused to grant Ceres the same terms, and Ceres finally signed the lease agreement because its prior agreement was expiring and its customers wanted assurances that Ceres would be able to provide services in the Port of Baltimore.

Under the agreement, Ceres agreed to pay 85% of the full MPA tariff for 44 acres for land, rental, and dockage, and to pay wharfage fees for the first 35,000 containers. Once Ceres reached the 35,000 threshold, Ceres agreed to pay per-container rates on a scale based on three tiers of container volumes. Ceres agreed to pay a $36 per-container shortfall fee, and agreed to pay 85% of the applicable tariff charges for handling empty containers, non-containerized wharfage, and shed rental. Ceres agreed to pay crane rental rates of 88% of the tariff rates for up to 500 hours of usage, 85% for 501-2400 hours of use, and 80% for use beyond 2400 hours. Ceres concedes that it received $600,000-$800,000 worth of concessions from the MPA. Even so, Maersk's rates were approximately half those of Ceres. In addition, Maersk did not have to pay any charges for empty containers.

Ceres also runs a barge service between Baltimore and Norfolk, Virginia. Ceres commenced running its own barge service in 1993 when Hale Intermodal Marine Company, a barge operator, shifted its operation from Ceres's terminal to Universal's terminal. Once Hale moved its traffic to Universal's terminal, Ceres decided to initiate its own barge service to compete with Hale.

4

Hale had negotiated a lease with the MPA in February 1992 with very favorable rates in order to compete with rates Hale could get in Norfolk. By February, 1993, Hale and the MPA had renegotiated the lease because the threat of competition with Norfolk has subsided. In October 1993, Hale and the MPA renegotiated their lease to include a two-tiered volume discount.

When Ceres started its barge service, Ceres and the MPA had already entered into the 1992 lease agreement at issue in this dispute. Ceres attempted to renegotiate the barge rate provisions of its lease with the MPA in order to obtain the same terms the MPA had offered Hale in the October 1993 negotiation, but the MPA would not renegotiate unless Ceres agreed to drop a state-court dispute on another matter.

As of February 1, 1996, the MPA established a uniform barge rate schedule applicable to all operators. After that period, Ceres and Hale paid identical charges for barge traffic, so the disputed rates cover only the period prior to the entry into force of that lease agreement.

In this case, however, the rates are tangential to the main dispute, which is whether the barged traffic moved by Ceres counts towards satisfying the overall container guarantee Ceres gave to the MPA in the 1992 lease. The MPA maintains Ceres may count the barged cargo towards its overall container guarantee only if it pays the full rate contemplated by the lease, while Ceres maintains, and the FMC found, that Ceres's barged cargo counts towards satisfying the overall container guarantee regardless of the rate paid.

II.

The FMC had jurisdiction over the case under the Shipping Act, 46 U.S.C. app. § 1713 (1994). The FMC issued a final order on October 10, 1997, and the MPA timely filed a petition for review under 28 U.S.C. § 2342(3).

III.

The threshold question before us is whether the FMC adequately addressed the MPA's first argument -- that Ceres was estopped from

5

challenging the validity of the lease either because it had voluntarily entered into the agreement or because it had waited 18 months before bringing a legal challenge. The FMC addressed the latter argument, noting that Ceres had brought suit well within the three-year statute of limitations and that finding waiver on the basis of such delay would render the statute of limitations a nullity by penalizing a party for waiting the full statutory period of limitation before bringing a claim. J.A. at 1715 n.59. While we readily agree with this conclusion, it does not dispose of the first portion of the MPA's argument.

The MPA unquestionably presented the waiver and estoppel claim to the FMC. The FMC recognized the argument was before it; in its thorough summary of the parties' arguments, the FMC set forth both the MPA's and Ceres's positions. J.A. at 1653-56, 1669, 1681-82. The MPA argued that Ceres freely negotiated and entered into the lease with full knowledge of the rates previously negotiated by Maersk. In response, Ceres contended that the MPA refused to sign any lease in which Ceres reserved its rights to challenge the lease in writing and that it had no choice but to enter into an agreement on the MPA's terms in order to ensure it could operate in the Port of Baltimore.

Despite its exposition of the claim, the FMC did not give its reasons for rejecting it. Certainly its disposition of Ceres's claim on its merits acted as an implicit rejection of the MPA's argument. Also, in a blanket statement at the end of its decision, the FMC stated that any issues not "expressly referred to herein have been fully considered as part of our de novo review of the proceeding, and are either denied or rendered moot." J.A. at 1716-17.

On appeal, counsel for the FMC argue that the FMC did not address the issue because the argument is without legal merit and can never be a defense as a matter of law. We are not deaf to this argument, and believe it would be a waste of judicial resources to remand to the FMC for its consideration of a claim completely lacking in merit. Also, "pure legal errors" require no deference to an agency's expertise and are reviewed de novo. Northeast Utils. Serv. Co. v. Federal Energy Reg. Comm'n, 993 F.2d 937, 944 (1st Cir. 1993). The first question, therefore, is to decide the degree of deference we owe to the agency's decision.

6

The FMC is an agency entrusted by Congress with the interpretation and application of the Shipping Act of 1984. Sea-Land Serv., Inc. v. Department of Transp., 137 F.3d 640, 645 (D.C. Cir. 1998). The touchstone case for all cases involving judicial review of agencies entrusted with the interpretation of statutes under their purview is Chevron U.S.A. v. Natural Resources Defense Council , 467 U.S. 837 (1984). Chevron dictates that we first look to see whether Congress has spoken directly on an issue. If it has, the inquiry is over, because the agency, as well as the court, must give effect to unambiguous Congressional intent. Id. at 842-43. If, however, the relevant statute is silent or ambiguous with respect to a given issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. While conducting step two of a Chevron analysis, a court may in some instances find that an agency's action, although not barred by the statute, is"arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice." Arent v. Shalala, 70 F.3d 610, 620 (D.C. Cir. 1995) (Wald, J. concurring).

The FMC declined in this case to address the MPA's estoppel claim and therefore articulated no rationale for its decision. Though we might nevertheless consider the issue and dismiss the defense if the analysis were purely a legal matter, we are not absolutely convinced that there may never be factual issues that would permit the assertion of an estoppel claim, though such issues may well not exist in this case. The record before us, though voluminous, is not complete. Given that limitation, we are reluctant to decide any issue in the first instance that may implicate factual considerations. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 at 420-21 (1971) (finding it necessary to review full administrative record before Secretary of agency at time of decision).

Another reason for preferring agency review in the first instance is that a central policy behind the Shipping Act -- that all shippers and carriers must be treated equally -- conflicts with the ability of ports, and shippers, to enter into leases with certain entities on preferential terms. "It is precisely in answering questions of this sort that the expertise and political accountability of administrative agencies command judicial deference." Sea-Land Serv., 137 F.3d at 645. The FMC has yet to give us the benefit of its expertise on estoppel in the terms

7

of negotiated leases,**1** except for its argument on appeal that the issue was so meritless as to require no consideration. We may not accept an agency counsel's "post hoc rationalizations for agency action." Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962). The applicability of this defense to negotiated leases is an important issue that will doubtless recur in the future; for that reason we prefer to have the FMC decide the issue in the first instance. Because of the limited record before us on appeal, and the FMC's greater familiarity with the intricacies of the statute it is entrusted to administer and with practical port administration, we remand for the agency to consider the merits of the MPA's estoppel claim.**2**

IV.

The proper interpretation of the contract between the MPA and

_____

**1** Ceres argues that it was obligated to enter into the lease with the MPA in order to ensure it could operate in the Port of Baltimore. While signing a lease guaranteeing discounted rates may have been the only economically feasible means of doing business in the port, and may have been the only way to guarantee itself the space in which to operate, we prefer to have the agency address that question given its experience as to how ports are administered in practice. Even without a lease, Ceres could presumably have paid the full tariff rate promulgated by the MPA and continued to operate in the Baltimore port.

**2** In the event the FMC finds the MPA's estoppel challenge to be without merit, we encourage the agency to revisit its conclusion on the damages due to Ceres and to explain more fully its conclusion that Ceres should not have to prove the damages it actually suffered but that damages should equal the difference between the rates charged. See, e.g., Interstate Commerce Comm'n v. United States, 289 U.S. 385 (1933) (when discrimination and that alone is gist of offense, difference between one rate and another is not the measure of damages suffered by the shipper); Ballmill Lumber & Sales Corp. v. Port of New York, 11 F.M.C. 494, 508-11 (1968) (complainant must prove pecuniary loss resulting from a violation of section 16 First of Shipping Act of 1916 (predecessor to 46 U.S.C. app. § 1709(b)(11)); but see Valley Evaporating Co. v. Grace Line, Inc., 14 F.M.C. 16, 25 (1970) (if equality of treatment is absolute, effect of competition becomes irrelevant and the measure of damages simply becomes the difference between the rate charged and collected and the rate that would otherwise have applied).

Ceres as it relates to barge cargo will remain in controversy regardless of whether the FMC determines that Ceres may properly challenge the lease agreement. We therefore address that argument here.

The FMC's "interpretation of contracts filed with it is entitled to deference." A/S Ivarans Rederi v. United States, 895 F.2d 1441, 1447 (D.C. Cir. 1990); Consolidated Gas Supply Corp. v. Federal Energy Reg. Comm'n, 745 F.2d 281, 291 (1984) ("[I]nterpretation of a contract by the federal agency concerned is entitled to deference."). If a contract is silent or ambiguous on a particular issue, we will defer to an agency's reasonable construction of the contract. A/S Ivarans Rederi v. United States, 938 F.2d 1365, 1368-69 (D.C. Cir. 1991).

At the time the MPA and Ceres entered into their lease agreement, Ceres did not have a barge service of its own; it operated as a stevedore/MTO for Hale. The lease agreement provided that "containers carried on barges [through the Ceres terminal] will be counted towards the loaded container guarantee, but containers transhipped by the vessels and barges in Baltimore will be counted only once." J.A. at 407. According to the MPA, that provision excluded Hale's barge traffic because even then Hale's barges operated at a discounted rate and the parties did not contemplate that such traffic should be able to satisfy the guarantee. Brief of the MPA, p.37 & n.34; Testimony of James J. White, in J.A. at 717-18. The MPA points to the schedule of cargo rates in section seven of the lease agreement, J.A. at 7-8, and states that the rates paid by Ceres/Hale for Hale's barge traffic fell below those amounts even before Hale renegotiated its lease in October. Brief of the MPA, pp. 36-37. The MPA therefore argues that, reading the lease agreement as a whole, Ceres may only use the barge traffic to satisfy the overall container guarantee if it is obligated to pay the container rates promulgated in the agreement for barge traffic.

The FMC rejected this argument, relying on the plain language of the contract, which provided that containers moved by barge counted towards Ceres's overall container guarantee. J.A. at 1715. At the time the parties entered into the lease, Ceres did not operate a barge service, but handled containers moved on barges operated by Hale. If the lease did not contemplate that Ceres's handling of Hale's barge cargo could be counted to satisfy the overall container guarantee, including such a statement in the lease would have made no sense, because no

9

other barge traffic was at issue. Certainly nothing in the lease excluded Hale's barge traffic from Ceres's container guarantee.

We find that the FMC did not err in concluding that the containers moved by Ceres's barge service should count towards satisfying its overall container guarantee. The FMC interpreted any ambiguity in the contract in a reasonable manner that was consistent with the terms of the contract. See A/S Ivarans Rederi, 938 F.2d 1368-69 (if agreement is silent, or perhaps internally inconsistent, we defer to FMC's reasonable construction of contract). We accordingly affirm the FMC's decision on the barge cargo issue.

V.

We remand the case to the FMC for its consideration of the MPA's claim that Ceres was estopped from challenging the terms of its lease with the MPA. We affirm the FMC's decision that Ceres's barge traffic should count towards satisfying the overall container guarantee Ceres gave in its lease.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

10