# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 4, 2025          Decided June 24, 2025

No. 24-1007

MSC MEDITERRANEAN SHIPPING COMPANY S.A.,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

MCS INDUSTRIES, INC.,
INTERVENOR

———

Consolidated with 24-1262

———

On Petitions for Review of an Order
of the Federal Maritime Commission

———

*John Longstreth* argued the cause for petitioner. With him on the briefs were *Michael F. Scanlon* and *Christiana K. Goff*.

*Paul W. Hughes*, *Andrew A. Lyons-Berg*, and *Grace Wallack* were on the brief for *amicus curiae* World Shipping Council in support of petitioner.

*Harry J. Summers*, Attorney-Advisor, Federal Maritime Commission, argued the cause for respondents. With him on the brief was *Phillip "Chris" Hughey*, General Counsel.

*Matthew J. Reynolds* argued the cause and filed the brief for intervenor in support of respondents.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Shipping Act of 1984 ("Act"), 46 U.S.C. § 40101 *et seq*, was enacted to "(1) establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs; (2) ensure an efficient, competitive, and economical transportation system in the ocean commerce of the United States; (3) encourage the development of an economically sound and efficient liner fleet of vessels of the United States capable of meeting national security needs and supporting commerce; and (4) promote the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water in the foreign commerce of the United States, and by placing a greater reliance on the marketplace." 46 U.S.C. § 40101. The Federal Maritime Commission ("Commission" or "FMC") is responsible for overseeing the "common carriage of goods by water in foreign commerce" under the Act. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 96 (2010) (cleaned up). As explained below, in addressing alleged violations of the Act, the Commission has the authority to, *inter alia*, receive complaints, pursue investigations, subpoena

witnesses and evidence, oversee discovery, conduct hearings, issue orders, issue reparation orders, and seek injunctive relief. 46 U.S.C. §§ 41301-41310. The Shipping Act also authorizes the Commission to issue regulations outlining discovery procedures that conform with the Federal Rules of Civil Procedure. *Id.* § 41303(a)(2). Pursuant to this authority, the Commission has adopted regulations making it clear that an Administrative Law Judge ("ALJ") may issue an order "dismissing the action or proceeding or any party thereto, or rendering a decision by default against the disobedient party" for failure to comply with discovery orders. 46 C.F.R. § 502.150(b)(3).

Carriers and shippers who enter service contracts covered by the Act must file copies of their agreements with the Commission. *See* 46 U.S.C. § 40502(b). The Act specifies certain essential terms the agreements must contain, *id.* § 40502(c), and the Commission must ensure that certain regulated entities do not operate in violation of the filed agreements. *See id.* §§ 41104(a)(2)(A), 41102(b). The Commission also ensures that entities do not engage in fraudulent or "unjust or unfair" practices to obtain non-market transportation rates, *id.* § 41102(a), and that common carriers "establish, observe, and enforce just and reasonable regulations and practices" related to "receiving, handling, storing, or delivering property," *id.* § 41102(c).

This case emanates from a dispute between Petitioner MSC Mediterranean Shipping Company S.A. ("Mediterranean"), the world's largest container shipping company, and Intervenor MCS Industries, Inc. ("MCS"), a shipper. In 2021, MCS filed a complaint with the Commission alleging that Mediterranean had violated the Act in part by failing to provide cargo space as agreed, forcing MCS to pay higher rates on the spot market during the Covid-19 pandemic,

refusing to deal with MCS, discriminating against shippers with respect to certain ports, and systematically engaging in unreasonable business practices.

Mediterranean initially provided some discovery material to MCS. However, it has since declined all additional discovery requests because, in its view, the information sought concerns matters that are unrelated to MCS and its cargo. Mediterranean has also claimed that the Commission lacks jurisdiction over this case because the violations raised by MCS's complaint involve routine breach of contract claims which are not covered by the Act.

Mediterranean also asserts that it cannot comply with the Commission's discovery orders because its business documents are generally located in its headquarters in Switzerland, and Swiss law precludes it from producing materials in response to discovery orders without first obtaining Swiss authorization. When Mediterranean attempted, as authorized by the ALJ, to obtain such authorization pursuant to the Hague Convention, a Swiss court rejected the request because it found that administrative proceedings did not fall within the scope of the Convention. After additional rounds of requests from the ALJ that Mediterranean produce the documents in question, or at the very least confirm that they cannot be produced from Mediterranean's American subsidiaries, Mediterranean has continued to stonewall by reiterating its rejection of the viability of MCS's claims. Following multiple warnings, the ALJ ordered Mediterranean to either produce the documents or show cause why a default judgment should not be entered against it. After Mediterranean continued to resist the discovery orders and the Commission's jurisdiction, the ALJ issued a default judgment ordering Mediterranean to pay reparations to MCS. The Commission affirmed this judgment in part, remanding for the ALJ to

recalculate the reparations amount and to assess whether sanctions might also be appropriate for Mediterranean's delay of the proceedings. *See id.* § 41302(d). The Commission then affirmed the ALJ's order on remand.

Mediterranean now petitions for review. It contends that the Commission had no jurisdiction over MCS's complaint and that the Commission abused its discretion in issuing a default judgment because it did not properly justify the action or appropriately consider alternative sanctions. Mediterranean additionally claims that the Commission erred in declining to invoke procedures under § 41108(c)(2) to resolve the discovery issue in this case. Although the reparations award was the subject of dispute below, Mediterranean does not challenge that award here, including whether the Commission erred in issuing reparations without a jury trial under the Seventh Amendment of the U.S. Constitution. These issues have therefore been forfeited. For the reasons detailed below, we deny Mediterranean's petitions for review.

## I.     BACKGROUND

### A.  *Statutory and Regulatory Background*

As discussed above, the Shipping Act regulates overseas commerce of the carriage of goods. To this end, it imposes regulatory requirements on ocean common carriers, including general rate and tariff requirements. *See* 46 U.S.C. § 40102(7) (defining common carriers); *id.* § 40501(a)-(b) (describing tariff system); *see also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 642 (D.C. Cir. 1998) (discussing the statute's regulation of common carriers). Agreements between ocean common carriers must be filed with the Commission, which may reject agreements that fail to meet statutory requirements. *See* 46 U.S.C. §§ 40301(a), 40302(a), 40304(b).

Relevantly here, the Act also regulates the commercial relationships between ocean common carriers and the shippers whose cargo they carry. *See id.* § 40102(23) (defining shippers). Ocean common carriers and shippers transact through service contracts, in which the shipper will commit to providing a certain amount of cargo over a fixed time period, and the carrier will in turn commit to transporting such cargo at a fixed rate. *See id.* § 40102(21). The Act requires that covered shippers and carriers file their service contracts with the Commission, and that the contracts provide for certain essential terms. *See id.* § 40502(b), (c).

The Act imposes "[g]eneral prohibitions" on regulated entities. *See id.* § 41102. These include obtaining transportation at a cost below the applicable rates, *id.* § 41102(a), and operating contrary to certain filed agreements, *id.* § 41102(b). Additionally, this section requires that regulated entities, including common carriers, "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." *Id.* § 41102(c).

The Act also imposes certain requirements on carriers specifically. *See id*. § 41104(a). The statute precludes carriers from providing transportation at rates below the tariff or service contract rates by means of false billing, measurement, classification or "any other unjust or unfair" means. *Id.* § 41104(a)(1). And carriers may not "provide service in the liner trade that is . . . not in accordance with" a filed service contract. *Id.* § 41104(a)(2)(A). Similarly, carriers may not employ "unfair or unjustly discriminatory practice[s]" or "give any undue or unreasonable preference or advantage" for services pursuant to a service contract "with respect to any port," *id.* § 41104(a)(5), (a)(9), and may also not "unreasonably refuse to deal or negotiate" with shippers, *id*. § 41104(a)(10).

Congress has authorized the Commission to enforce the Act's provisions through both independent investigations, *id.* § 41302(a), and through adjudications of complaints filed by third parties, *id.* § 41301(a). Not all Shipping Act violations may be enforced by complaints, however. *See id.*; *id.* §§ 41307(b), 41104(b). Relevantly here, the Act provides that, "[u]nless the parties agree otherwise, the exclusive remedy for a breach of a service contract is an action in an appropriate court," rather than a complaint filed with the Commission. *Id.* § 40502(f).

As discussed above, in adjudicating complaints and conducting investigations, the Commission has the power to order discovery, *see id.* § 41303, to seek injunctive relief, and to issue reparations orders for injury to parties, *see id.* §§ 41305, 41306, 41307. It may also impose sanctions for a party's undue delay to the adjudicative proceedings and for failure to comply with discovery orders, including rendering a decision by default against the disobedient party. *See id.* § 41302(d); 46 C.F.R. § 502.150(b). The Act also authorizes the Commission to impose some "additional penalties" on a common carrier as sanctions for failure to comply with certain provisions of the Act. *See* 46 U.S.C. § 41108.

## B. Facts

In May 2020, Petitioner Mediterranean, a carrier with headquarters located in Switzerland, entered into a service contract with intervenor MCS, a Pennsylvania-based shipper, to carry MCS's cargo. Under the parties' agreement, which was filed with the Commission, MCS was to offer a minimum amount of cargo for shipping by Mediterranean from China to the U.S. at a set rate. The agreement also provided that any disputes arising out of or in connection with the contract

between the parties would be settled through binding arbitration.

The Covid-19 pandemic, and ensuing supply chain disruptions, complicated this contractual arrangement. MCS alleges that, starting in October 2020, Mediterranean refused to allocate the contracted-for space in its vessels to MCS cargo, and stopped taking cargo from specific Chinese ports. Nonetheless, in May 2021, MCS renewed its service contract with Mediterranean, for a reduced amount requirement limited to fewer ports.

In July 2021, MCS filed a complaint with the Commission, alleging that Mediterranean had violated the Act when it provided services outside of the service contracts' terms, *see* 46 U.S.C. § 41104(a)(2)(A), and that it had discriminated against MCS's cargo in violation of sections 41104(a)(5) and 41104(a)(9), which prohibit discrimination as to ports. MCS also originally claimed that Mediterranean had engaged in collusion with other carriers, and listed another shipping carrier as a defendant, but settled those claims separately and dropped them as to Mediterranean.

As amended, MCS's complaint alleges that Mediterranean took advantage of the supply chain disruptions during the pandemic to adopt coercive practices that increased carriage rates, including the practice of "blank sailings" of vessels that were empty, to "creat[e] artificial scarcity and boost[] prices on the spot market." Amend. Compl. ¶ 5, Joint Appendix ("J.A.") 130. Additionally, according to the complaint, Mediterranean would sell the contracted-for space in its vessels to other shippers for a premium, refusing to carry MCS's cargo or even to negotiate for the already contracted-for carriage unless MCS paid a premium outside the contract rates.

MCS alleges that these systematic practices, which were also in breach of the parties' service contract, amounted to several Shipping Act violations, including: (1) "unjust and unreasonable practices" in violation of § 41102(c) of the Act, by failing to maintain or disclose business records; (2) engaging in services outside of the service contracts filed with the Commission, which the Shipping Act prohibits under § 41104(a)(2); (3) "unfair and unjustly discriminatory practice" against MCS in violation of § 41104(a)(5), including by preferencing high-priced cargo; (4) the continuous practice of giving "unreasonable preference and advantage" to certain shippers in violation of § 41104(a)(9); and (5) unreasonable refusal to deal with MCS in violation of § 41104(a)(10).

The amended complaint requested that the Commission launch an investigation into the alleged practices, and sought declaratory and injunctive relief, plus reparations for the added expense MCS incurred as a result of the alleged conduct. In August 2021, the Commission launched a separate inquiry into the alleged practices by several common carriers, including Mediterranean. And Congress has since amended the Shipping Act to address the supply chain issues caused by the pandemic, including conduct of the sort that MCS alleges took place here. *See* Ocean Shipping Reform Act of 2022, Pub. L. 117-146, 136 Stat. 1272, 1274 (June 16, 2022) (adding new violation provisions forbidding "unreasonably refus[ing] cargo space accommodations when available" and expanding § 41104(a)(10) to include refusals to deal "with respect to vessel space accommodations provided by an ocean common carrier").

Mediterranean's primary defense to these allegations is that they are outside of the Commission's jurisdiction because they are essentially breach of contract claims, to be settled in arbitration as provided for in the parties' agreements.

Mediterranean contends that these claims do not constitute valid Shipping Act violations that may be enforced by complaint. *See* 46 U.S.C. § 40502(f). Mediterranean has accordingly initiated separate arbitration proceedings against MCS.

### C. Procedural History

What is primarily at issue before the court in this case is Mediterranean's conduct during the course of the Commission's adjudicatory proceeding. First, rather than moving to dismiss MCS's claims initially, Mediterranean did not challenge the action before the ALJ until after the case proceeded to discovery. After Mediterranean had already produced initial batches of documents, it switched gears and claimed that it was not required to produce an additional round of discovery because the requested material did not concern valid claims under the Shipping Act. The ALJ rejected these objections and ordered Mediterranean to produce the requested documentation. *See* ALJ's Order Granting Motion to Compel (Dec. 8, 2021) ("First Discovery Order"), J.A. 78. The order required that Mediterranean identify, *inter alia*, individuals with knowledge of the events in question, produce additional communications concerning MCS regarding specific geographic limitations tied to ports between California and China, and produce information on unbooked space in Mediterranean's vessels that it allegedly refused to allocate to MCS. *See id.* at 5-13, J.A. 82-90.

Only after this discovery order did Mediterranean file a motion to dismiss, arguing that MCS had failed to state valid claims under the Shipping Act and that, as a result, the Commission lacked jurisdiction over the proceedings that had been ongoing for six months. MCS then moved to amend its complaint. In February 2022, the ALJ denied Mediterranean's

motion to dismiss and granted MCS's motion to amend. The ALJ also ordered the parties to report on how discovery would proceed, having determined that discovery regarding Mediterranean's business practices was relevant to MCS's allegations of systemic practices in violation of the Act, including refusal to deal and discrimination.

Mediterranean continued to refuse to abide by the ALJ's discovery order. In the parties' subsequent joint status report, Mediterranean argued that the discovery order triggered Article 271 of the Swiss Criminal Code, which requires Swiss companies to obtain Swiss authorization before they can be compelled to produce business records located in Switzerland. *See* Schweizerisches Strafgesetzbuch [StGB] [Criminal Code] Dec. 21, 1937, art. 271, para. 1 (Switz.), https://perma.cc/9GJU-LUZF (last visited June 9, 2025). Although Mediterranean had never raised this concern in its opposition to the motion to compel, and although Mediterranean could have arguably produced these documents voluntarily without potentially triggering Article 271, MCS agreed to follow Hague Convention procedures to obtain Swiss authorization for discovery. Accordingly, MCS and Mediterranean jointly drafted a Letter of Request pursuant to the Hague Convention, and requested that the ALJ authorize its filing with Swiss authorities. The ALJ granted this request.

The Letter of Request authorized by the ALJ specified that it was to be filed with a Court of First Instance in Geneva. But the Swiss court in question rejected the request, finding that an action in an administrative proceeding did not fall within the scope of the Hague Convention. Mediterranean maintains that this was a legal error by the Swiss court, and blames MCS for this outcome, arguing that MCS filed the request at the wrong venue (despite the order by the ALJ that it be filed there) and

failed to explain the nature of the proceedings before the Commission.

The parties then agreed that this dilemma should be resolved by submitting a second Letter of Request under the Hague Convention. MCS also recommended that the ALJ invoke the procedures under 46 U.S.C. § 41108, a Shipping Act provision requiring, *inter alia*, that failure to disclose information that is allegedly protected by the laws of a foreign country must be raised with the Secretary of State, who will then seek to resolve the matter with the foreign nation. *See id.* § 41108(c)(2). Although this provision applies only when certain penalties are being contemplated, *see id.* § 41108(c)(1), MCS nevertheless proposed to the ALJ that the next step in their discovery dispute should be to notify the Secretary of State, who must then negotiate with Switzerland to resolve this problem.

The ALJ rejected the suggestion to submit a second Hague Convention request. Instead, relying on federal caselaw, the ALJ found that Mediterranean had failed to show that pursuit of discovery would create a risk of criminal prosecution for Mediterranean. The ALJ thus determined that Mediterranean had not shown that Hague Convention procedures were required. It then ordered, again, that the documents be produced. ALJ's Order Requiring Production of Discovery 4 (July 29, 2022) ("Second Discovery Order"), J.A. 208.

Mediterranean has continued to refuse to follow the ALJ's discovery orders. It does not allege that the ALJ's analysis of federal caselaw was incorrect, but that the Swiss Court's ruling was in error. In Mediterranean's view, pursuit of discovery involves risk that disclosure of certain records could expose Mediterranean to criminal liability under Swiss law. Mediterranean has never proposed to appeal the adverse

judgment of the Swiss court. Instead, it asked the Commission for an extension of time so that it could seek a contrary position from the Swiss Federal Department of Justice and Police, an agency located within the Swiss executive branch.

At Mediterranean's behest, the Swiss Federal Department submitted a "Notice of Advice" stating that, "[c]ontrary to the decision . . . of the Geneva Court of First Instance, the case is in fact a civil and commercial matter," so that the Geneva Court's views "ha[ve] no material effect," and Hague proceedings must be followed. Decision of Federal Department of Justice and Police 3-4 (Nov. 7, 2022), J.A. 283-84. The Swiss Federal Department also interpreted the complaint before the Commission as a matter concerning the "relationship between two subjects of private law arising from . . . a contract" and involving "damages, a typical civil law claim" – despite the Commission having previously ascertained that the matter also involves specific Shipping Act violations. *Id.* at 3, J.A. 283. The Swiss Federal Department then advised that Mediterranean could re-file its Hague request, but it declined to authorize the production pursuant to the already filed request. *Id.* at 4, J.A. 284.

In September 2022, the ALJ denied Mediterranean's extension request, finding that the Swiss executive branch's advice took no position on the merits of the discovery matter at issue before the Commission. *See* ALJ's Order Denying Motion for Extension and Order to Show Cause (Sep. 8, 2022) ("Show Cause Order"), J.A. 219-21. The ALJ concluded that Mediterranean's arguments had been ruled unavailing by the ALJ's prior order, which had already determined that Mediterranean had never shown that it would face significant criminal risk by complying with the discovery order. The ALJ ruled that Mediterranean could not continue to relitigate the

same issue and further delay the administrative proceeding. *Id.* at 2, J.A. 220.

The ALJ then ordered, now for the third time, that Mediterranean either produce the discovery or show cause why default judgment should not be entered against it. *Id.* at 3, J.A. 221. After Mediterranean objected to the Show Cause Order on the grounds that it had already produced all the discovery it deemed relevant and that the ALJ had erred when she found that the complaint alleged valid Shipping Act violations, the ALJ issued a default judgment against Mediterranean. *See* ALJ's Initial Decision on Default (Jan. 13, 2023) ("Initial Default Order"), J.A. 286-308. This order was affirmed by the Commission in relevant part, adopting the ALJ's conclusions as to the discovery issue and as to the jurisdiction question. *See* Commission's Order Partially Affirming Initial Decision on Default 11-24 (Jan. 3, 2024) ("Commission's First Default Order"), J.A. 314, 324-37. The Commission then remanded the matter for the ALJ to determine whether the default could be supported by additional statutory grounds of delay to the proceedings under 46 U.S.C. § 41302(d). The ALJ did so on remand, and the Commission affirmed this ground for default as well. *See* Commission's Order Affirming Initial Decision on Remand (July 16, 2024) ("Commission's Second Default Order"), J.A. 457-94. Mediterranean then filed the instant petitions, challenging both the initial default order and the Commission's order affirming the ALJ's decision on remand.

## II.   ANALYSIS

### A.  Standard of Review

We review *de novo* challenges to the Commission's jurisdiction under the Shipping Act. *See Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 496-97 (D.C. Cir.

2009) (reviewing *de novo* the question of the Commission's jurisdiction where it "necessarily depend[s] upon the meaning and interpretation of" the Shipping Act); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 n.4 (2024).

An order of default is generally reviewed for abuse of discretion. *See Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998). The Commission's regulations have incorporated the Federal Rules of Civil Procedure to govern review of default orders. *See* 46 C.F.R. § 502.12; FED. R. CIV. P. 37(b)(2)(A). Under the federal procedural standard, we assess whether a default order constituted a justified response within Rule 37(b) by considering three key factors: (1) the prejudice to the other party, which must present its case without the ordered discovery; (2) the burden on the tribunal, which must spend its resources addressing delays caused by noncompliance with its orders; and (3) the need to deter bad faith conduct in the future. *Webb*, 146 F.3d at 971-75. Any one of these factors can alone be grounds for a default judgment. *Id.* at 971.

Additionally, although tribunals have "broad discretion to impose sanctions for discovery violations," *Bonds v. District of Columbia*, 93 F.3d 801, 807 (D.C. Cir. 1996), our review of a default judgment as a discovery sanction is "more thorough," considering the "drastic" nature of a sanction which "deprives a party completely of its day in court," *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 4 (D.C. Cir. 2015) (quoting *Webb*, 146 F.3d at 971). Thus, a default judgment is only appropriate as a discovery sanction if "the litigant's misconduct is accompanied by willfulness, bad faith, or fault." *Reliable Limousine*, 776 F.3d at 4 (internal quotation marks and citation omitted). We therefore require that a lower tribunal sufficiently "explain its decision to award default judgment instead of a lesser sanction," even if

exhausting alternative sanctions is not required. *Id.* at 4, 7 (internal quotation marks and citation omitted).

### B. The Commission Properly Exercised Jurisdiction Over this Case

At the outset, we reject Mediterranean's contention that the instant case falls outside of the Commission's jurisdiction, and that the default judgment was therefore beyond the scope of its statutory authority. Mediterranean argues that because MCS's claims are all premised on the service agreements between the parties, they fall outside the scope of the Commission's jurisdiction under 46 U.S.C. § 40502(f), and must instead be addressed in federal arbitration, as provided for in the agreements. We find no merit in Mediterranean's position.

As we have explained, "[p]rivate regulated parties cannot agree to waive the subject matter jurisdiction of the agency charged with the statutory responsibility to insure that parties implement agreements as approved by and filed with that agency." *A/S Ivarans Rederi v. United States*, 895 F.2d 1441, 1445 (D.C. Cir. 1990) (rejecting contention that arbitration clause in an agreement filed with the FMC divested the agency of jurisdiction).

Mediterranean correctly notes that Congress did not intend for the Commission to have jurisdiction over *all* claims emanating from disputes regarding service contracts filed under the Shipping Act. Indeed, the Shipping Act includes 46 U.S.C. § 40502(f), which provides that "[u]nless the parties agree otherwise, the exclusive remedy for a breach of a service contract is an action in an appropriate court." The question is therefore what distinguishes claims of Shipping Act violations, which are actionable through complaints filed with the Commission, *see id.* § 41301(a), from breach of contract

claims, which must be litigated in the appropriate court or forum.

The "best reading of the statute," *Loper Bright*, 603 U.S. at 400, makes it plain that § 40502(f) cannot be so broad as to swallow the Commission's statutory authority to adjudicate whole categories of Shipping Act violations that clearly contemplate Commission enforcement. As we explain below, both the terms of the statute and the applicable caselaw confirm this point. *See, e.g.*, *A/S Ivarans*, 895 F.2d at 1446 (holding that "parties may not construct an obstacle to the FMC's right to enforce the Shipping Acts").

For instance, § 41104(a)(2)(A) makes it a violation of the Act for a carrier to "provide service in the liner trade that is not in accordance with the rates, charges, classifications, rules, and practices contained in . . . a service contract." This indicates that deviation from a service contract may be a violation of the Shipping Act. *See also id.* § 41102(b)(2) (making it a "[g]eneral prohibition[]" of the Shipping Act for regulated entities to operate "not in accordance with the terms of" certain agreements filed with the Commission). It is obvious that, under these provisions, a claim of breach of the parties' service contract might overlap with violations of the Shipping Act.

Moreover, the Act broadly allows persons to file complaints "alleging a violation" of the Act and to "seek reparations for an injury to the complainant caused by the violation" – providing relief that sounds similar to a breach of contract remedy. *Id.* § 41301(a). Only two subsections of the entire Shipping Act are expressly exempted from private enforcement. *See id.* (limiting a party's ability to enforce § 41307(b)(1) before the Commission); *id.* § 41104(b) (same as to § 41104(a)(13)). For all other violations, the Act broadly allows the recovery of reparations for the injury caused by the

violation in question. *See id.* § 41305(b). In fact, the Act specifically lays out how reparations are to be calculated for certain specific violations by common carriers. *See id.* § 41305(c)-(d).

Faced with the somewhat paradoxical language of § 40502(f), the Commission has devised a test to weed out claims that, although invoking specific Shipping Act provisions, are in essence breach of contract claims that fall outside the Commission's purview. In *Cargo One, Inc. v. Cosco Container Lines Company*, the Commission explained that

> [g]iven the specificity the Shipping Act provides with respect to the types of complaints a person may <u>not</u> bring . . . and given the specificity as to types of relief available for various violations of the Prohibited Acts, we believe that Congress did not intend that [§ 40502(f)'s] "exclusive remedy" language would nullify the . . . rights of complainants to bring suit on any matter tangentially or even substantially related to service contract obligations.

2000 WL 1648961, at *12 (F.M.C. Oct. 31, 2000).

In *Cargo One*, the Commission expressed a valid concern that "strict deference" to § 40502(f) might "eviscerate[] other statutory rights and remedies envisioned by" the Shipping Act. *Id.* at *11. To address this issue, the Commission read the Act to allow complaints alleging claims that are "distinctly within the sphere of expertise Congress expected the Commission to utilize," such as undue discrimination, even if they relate to provisions in a service contract. *Id.* at *13. In other words, if a complaint involves "elements peculiar to the Shipping Act" and "raises issues beyond contractual obligations," then it is

presumptively properly before the Commission even if it also sounds in breach of contract. *Id.* at \*14. On the other hand, "allegations essentially comprising contract law claims" are presumptively barred by § 40502(f), unless the complainant can demonstrate that the claim is "more than a simple contract breach claim." *Id.*

Because all parties here embrace the *Cargo One* test and do not dispute its application here, we leave for another day the question of whether its interpretation of § 40502(f) comports with the terms of the statute. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 621 (1993) (where the parties did not disagree, the Court "assume[d] for purposes of [the] case that the regulation [at issue] reflect[ed] a sound reading of the statute"); *cf. Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 915 (2025) (declining to decide antecedent statutory-interpretation question regarding whether agency action was consistent with statutory directives because it was not the subject of the appeal). Thus, assuming that *Cargo One* is consistent with the Act, we find that its holding makes clear that the Commission had jurisdiction here, and the Commission properly applied its own precedent in addressing the matters at issue in this case. This is so because *Cargo One* itself allowed two Shipping Act violations that are at issue in this case: allegations of unjust and unreasonable practices in violation of § 41102(c), and of unreasonable refusal to deal in violation of § 41104(a)(10) – namely, counts I and V of the complaint against Mediterranean.

*Cargo One* held that the Commission presumptively has jurisdiction over, *inter alia*, four categories of claims: allegations "involving unfair or unjustly discriminatory practices, undue or unreasonable preferences, undue or unreasonable prejudice or disadvantage, and just and

reasonable regulations and practices." 2000 WL 1648961, at *15. These claims "are inherently related to Shipping Act prohibitions and are therefore appropriately brought before the Commission." *Id.* Mediterranean has never disputed these points from *Cargo One*. Nor has Mediterranean meaningfully explained why the *Cargo One* presumption is rebutted based on the allegations in the complaint. While Mediterranean argues that count I alleges no more than an "alleged failure to perform . . . contractual duties," Petitioner Br. 27, count I alleges a systemic pattern and practice of misconduct that transcends one individual contractual dispute and claims statutory violations as to other shippers, too. The ALJ thus appropriately concluded that "[a]llegations in the amended complaint extend beyond allegations of breach of the service contract to allege practices that violate the Shipping Act, such as failing to maintain or provide booking reports, systematically preferring higher-priced cargo, and coercing surcharges." J.A. 123. Put differently, the complaint does not seek to litigate particular terms of the service agreements, but rather compliance with the Shipping Act in the course of performance under the contracts. And Mediterranean's opening brief makes no argument specific to count V and thus cannot rebut the *Cargo One* presumption as to this claim. As a result, we find that counts I and V of the complaint state claims which fall presumptively within the Commission's jurisdiction under *Cargo One*. These claims of unjust and unreasonable practices and the unreasonable refusal to deal are not actions that can be fully addressed in a suit for breach of contract.

The Commission's adoption and application of the *Cargo One* standard is hardly surprising. First, as explained above, the parties do not disagree that the standard adopted in *Cargo One* is controlling, so there is no issue on this. Second, Mediterranean contends that because its service contract included an arbitration provision, the Commission had no

jurisdiction over disputes involving claims emanating from contract disputes. Mediterranean is seriously mistaken.

In 1990, before the Commission's decision in *Cargo One*, this court rendered its decision in *A/S Ivarans*, 895 F.2d at 1441. We held that, regarding the Shipping Act:

> Private regulated parties cannot agree to waive the subject matter jurisdiction of the agency charged with the statutory responsibility to insure that parties implement agreements as approved by and filed with that agency. And just as assuredly, private parties may not agree to confer such powers on an arbitration panel. . . . Since Congress clearly envisioned a role for the FMC to play in investigating and adjudicating possible violations of the Shipping Acts, we think it rather extreme to conclude that the FMC "waived" its statutory obligations simply by approving an arbitration clause.

*Id*. at 1445 (first citing *Duke Power Co. v. FERC*, 864 F.2d 823, 829 (D.C. Cir. 1989); and then citing *Swift & Co. v. Fed. Mar. Comm'n*, 306 F.2d 277, 282 (D.C. Cir. 1962)). The Commission's approach here was clearly consistent with the rule from *A/S Ivarans* that "parties may not construct an obstacle to the FMC's right to enforce the Shipping Acts." *A/S Ivarans*, 895 F.2d at 1446.

And, as suggested by our decision in *A/S Ivarans* and later explained by the Commission, the Commission may retain jurisdiction over a complaint even as the parties pursue a separate resolution to breach of contract claims in arbitration. *See Anchor Shipping Co. v. Aliança Navegação E Logística Ltda.*, 2006 WL 2007808, at *10 (F.M.C. May 10, 2006). In *Anchor Shipping*, the Commission held that, "[a]lthough the

complainant in [the] case ha[d] already obtained an arbitration award relating to certain breach of contract allegations, the Commission [was still] obligated to hear those allegations particular to the Shipping Act." *Id.* The Commission went on to say that its "statutory mandate outweighs agreements between two private parties to arbitrate contractual disputes." *Id.* at *12.

Mediterranean contends that the Commission found jurisdiction below in disregard of administrative precedent. But Mediterranean's position finds no meaningful support in the administrative decisions issued since our holding in *A/S Ivarans* and the Commission's decisions in *Cargo One* and *Anchor Shipping. See, e.g.*, *Greatway Logistics Grp., LLC v. Ocean Network Express Pte. Ltd.*, 2021 WL 3090768, at *3-4 (F.M.C. July 16, 2021) (relying on *Cargo One* to find jurisdiction despite § 40502(f) because district courts cannot address Shipping Act violations even if breach of contract claims are proceeding before the courts in parallel to Commission proceedings); *Global Link Logistcs [sic], Inc. v. Hapag-Lloyd AG*, 2014 WL 5316345, at *5, *13 (F.M.C. Apr. 17, 2014) (dismissing claims alleging that shipper was entitled to higher rates where the service contract itself allowed rate increases at respondent's discretion, while still affirming that the Commission had jurisdiction over the complaint); *Dnb Exps. LLC v. Barsan Glob. Lojistiks*, 2011 WL 7144017, at *4-5 (F.M.C. July 7, 2011) (dismissing claims where complainants expressly claimed breach of contract only, and "d[id] not allege a violation of the Shipping Act").

Finally, as noted above, there is no doubt in this case that counts I and V in the complaint involve matters distinctly within the sphere of expertise that Congress expected the Commission to apply to resolve complaints under the Act. These counts line up squarely with the holding in *Cargo One*.

The remaining counts are less clear. Count II of the complaint, for instance, is based on the same Shipping Act provision that was precluded by the Commission in *Cargo One*. *See* 2000 WL 1648961, at *15. But we need not reach the question of whether MCS has sufficiently stated a claim as to counts II, III and IV, because even assuming that the Commission lacked jurisdiction over count II and that MCS failed to state a claim as to counts III and IV, we would nevertheless sustain the default judgment based on the Commission's valid exercise of jurisdiction over counts I and V. As discussed above, if a complaint "alleges certain violations that are particular to the Shipping Act," the Commission has jurisdiction and must address the matter. *Anchor Shipping*, 2006 WL 2007808, at *10.

The default judgment orders challenged here, and the reparations awarded, do not depend on the viability of individual counts. Rather than the merits of MCS's claims, the basis for the default judgment was Mediterranean's conduct during litigation, specifically its non-compliance with the ALJ's discovery orders. And, in any event, Mediterranean has failed to argue that the default judgment cannot be sustained based on one claim alone. Therefore, we need only conclude, as we do, that the Commission properly exercised its jurisdiction over the proceedings below because counts I and V of the complaint concern matters that are particular to the Shipping Act.

## C. The Commission Acted Within Its Authority When It Issued a Default Judgment

Having concluded that the Commission had jurisdiction over the proceedings in this case, we next consider Mediterranean's challenge to the default judgment. The Act provides that the Commission "may impose sanctions" if it

"determines that it is unable to issue a final decision because of undue delay caused by a party" to investigative or adjudicative proceedings. *See* 46 U.S.C. § 41302(d). Such sanctions may include "issuing a decision adverse to the delaying party." *Id.* Additionally, Commission regulations provide that an ALJ may issue an order "dismissing the action or proceeding or any party thereto, or rendering a decision by default against the disobedient party" for failure to comply with discovery orders. 46 C.F.R. § 502.150(b)(3). We conclude that the Commission did not abuse its discretion.

### 1. Forfeited Argument

In assessing the efficacy of the default judgment, we first note that Mediterranean has forfeited one of its principal claims. Mediterranean never contested the standard that the Commission applied below in rejecting its claim that the Swiss blocking statute precluded the discovery, which was whether Mediterranean demonstrated that disclosure of relevant records would expose it to a genuine risk of criminal prosecution. Mediterranean did not raise or preserve this issue. Therefore, we have no occasion to second-guess the judgment of the Commission on this issue. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).

The ALJ concluded that Mediterranean had not provided any evidence of why the specific discovery order would violate Article 271. Indeed, there was nothing in the record to confirm that the documents in question were even located in Switzerland. And the ALJ indicated that Mediterranean had pointed to nothing to indicate that it faced any real risk of actual prosecution. Therefore, the ALJ held that Mediterranean had failed to meet its burden under the applicable law.

The ALJ specifically concluded that Mediterranean had failed to show that Article 271 "blocks the production of the documents at issue." Initial Default Order 9, J.A. 294. In so deciding, the ALJ defined its "ultimate task" as "'not to definitively determine what Swiss law is, but rather to decide whether the risk of prosecution under Article 271 is so great' as to warrant a protective order." *Id.* at 10, J.A. 295 (quoting *Microsoft Corp. v. Weidmann Elec. Tech. Inc*., No. 15-cv-153, 2016 WL 7165949, at *12 n.14 (D. Vt. Dec. 7, 2016)). In support of this rule statement, the ALJ cited to *EFG Bank AG v. AXA Equitable Life Insurance Co.*, which observed that the parties there had failed "to identify a single case in which a party was found to have violated Article 271 by disclosing its own documents absent a court order threatening criminal sanctions" and ruled that "a mere 'risk' that Article 271 might be applied is insufficient to carry [the objector's] burden." No. 17-cv-4767 (JMF), 2018 WL 1918627, at *2 (S.D.N.Y. Apr. 20, 2018).

The ALJ's conclusion is bolstered by cases that further highlight the principle that the operative question is not whether disclosure might be unlawful, but rather whether there is any actual risk of prosecution. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MDL-1775, 2010 WL 2976220, at *2 (E.D.N.Y. July 23, 2010) ("The possibility that [defendant] will suffer hardship in complying with a discovery order is speculative at best. Although the defendant cites the prospect of criminal sanctions if it violates the blocking statute, it has cited no instance in which such sanctions have ever been imposed."); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 526 (S.D.N.Y. 1987) ("In examining the hardship on the party from whom compliance is sought, courts also look at the likelihood that enforcement of foreign law will be successful."), *cited with approval in Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013). The ALJ also cited to *Belparts*

*Group, N.V. v. Belimo Automation AG*, which held that "[a]long with [its] burden of persuasion, the objecting party bears a corresponding burden of production," requiring the objector to "provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." No. 21-cv-00334 (SALM), 2022 WL 1223018, at *4 (D. Conn. Apr. 26, 2022) (internal quotation marks and citation omitted).

Having stated these rules, the ALJ continued to note that Mediterranean's Swiss counsel acknowledged a dearth of prosecutions under Article 271, save one case, which involved "a non-party providing Swiss banking documents to American prosecutors building a potential criminal case." Initial Default Order 10-11, J.A. 295-96. The ALJ distinguished that case on its facts. *Id.* at 11, J.A. 296; *see also Alfadda v. Fenn*, 149 F.R.D. 28, 35 (S.D.N.Y. 1993) (considering "the infrequency of prosecution under" the foreign law in assessing "the likelihood that [objector] would face prosecution" and concluding that it "is highly questionable"). The ALJ thus concluded that Mediterranean failed to show cause why a default judgment should not be issued against it for failure to comply with the discovery orders, and issued a default judgment.

Mediterranean neither disputes the standard the ALJ applied, nor argues that it met its burden under that standard. We therefore have no occasion to reject or endorse the standard the ALJ applied. Below, Mediterranean's Swiss counsel repeatedly opined as to the "risk of exposure under Article 271," that is, the "risk of falling within the scope of" the provision. J.A. 163; *see also* J.A. 164 (recommending Hague procedures "[t]o avoid any risk of violating Article 271"); J.A. 165 (under Hague procedures, "U.S. courts and litigants can,

and often do, . . . seek documents located in Switzerland without risking violating Swiss law"). In fact, Mediterranean only asked its Swiss counsel to "outline what would be the risks under Swiss law should it be forced to comply," as opposed to assessing the potential for actual prosecution. J.A. 245. Before the ALJ, Mediterranean similarly contended that it could not comply "without risk of criminal exposure," J.A. 213. However, it never made any credible claims regarding the genuine probability of prosecution.

Not all illegal conduct, especially that at the periphery of liability, is charged. This is why the ALJ dismissed the Swiss counsel's memos, which concluded only that Hague procedures were required "to avoid any risk of violating Article 271." Second Discovery Order 2, J.A. 206 (internal quotation marks omitted).

It is also noteworthy that Mediterranean never claimed that the ALJ got the test wrong, and that possibility of a legal violation alone is the proper lens through which to consider fear of criminal sanctions, without resort to the likelihood of actual prosecution. Mediterranean never made that argument, below or on appeal. Indeed, Mediterranean appears to recognize that risk of prosecution is the proper standard. *See* Br. of Petitioner 46 (citing *Société Internationale Pour Participations Industrielles Et Commerciales v. Rogers*, 357 U.S. 197, 212 (1958), for the proposition that "[i]t is hardly debatable that fear of criminal *prosecution* constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign") (emphasis added). Yet, Mediterranean's briefing and support do not establish any genuine prospect of prosecution, instead only asserting something more amorphous: potential risk of violating the law. *See id.* at 40 (arguing that "Mediterranean

Shipping would be in criminal jeopardy under Swiss law if it complied with the discovery order"); *id*. at 45 (same).

Mediterranean's failure to contest the ALJ's formulation or application of the test precludes a finding that the ALJ abused her discretion or acted arbitrarily or capriciously. On the record before the court, there is no basis to find that the ALJ or the Commission erred in addressing this issue. *See Luu v. Comm'r of Internal Revenue*, No. 23-1149, 2024 WL 959876, at *1 (D.C. Cir. Mar. 6, 2024) (per curiam) (appellant's failure to challenge the standard applied by lower court means that it "has therefore forfeited any challenge to that aspect" of the lower court's decision).

### 2. Mediterranean Is Mistaken in Suggesting that the Commission Was Obliged to Use the Procedures in 46 U.S.C. § 41108 to Resolve the Discovery Issue

Mediterranean next contends that the Commission erred when it declined to invoke procedures under 46 U.S.C. § 41108 to resolve the discovery issue in this case. We reject Mediterranean's argument. Section 41108 is titled and principally focused on "additional penalties," *i.e.*, penalties not otherwise covered by the Act, that the Commission is authorized to use to sanction carriers who violate certain provisions of the Act. As we explain below, § 41108 has no application in this case because the Commission did not purport to use any "additional penalties" to sanction Mediterranean.

First, under § 41108(a), if a carrier violates paragraphs (1), (2), or (7) of section 41104(a) of the Act, the Commission may "suspend any or all tariffs of the common carrier, or that common carrier's right to use any or all tariffs of conferences of which it is a member, for a period not to exceed 12 months."

46 U.S.C. § 41108(a). Subsection (b) then outlines specific penalties for operating under a suspended tariff. *See id.* § 41108(b).

Second, under § 41108(c), the Commission may impose additional penalties on carriers that fail to comply with discovery orders: it may "suspend any or all tariffs" of a carrier that has "failed to supply information ordered to be produced," *id.* § 41108(c)(1)(A), and "request the Secretary of Homeland Security to refuse or revoke any clearance" the carrier's vessel requires to operate, *id.* § 41108(c)(1)(B).

Third, if, pursuant to subsections 41108(c)(1)(A) and (B), the Commission aims to sanction a carrier for failure to supply information pursuant to § 41108(c)(1), and the carrier "alleges" that the information or documents sought to be discovered are located in a foreign country and cannot be produced because of the laws of that country, "the Commission shall immediately notify the Secretary of State." *Id.* § 41108(c)(2). "[T]he Secretary of State shall promptly consult with the government of the nation within which the information or documents are alleged to be located for the purpose of assisting the Commission in obtaining the information or documents." *Id*.

Fourth, subsections 41108(d) and (e) highlight the singularly unique role of the "additional penalties" provisions in § 41108. For starters, § 41108(d) provides that, if the Commission finds that a carrier "has unduly impaired access of a vessel documented under the laws of the United States to ocean trade between foreign ports, the Commission shall take action that it finds appropriate, including imposing any of the penalties authorized by [§ 41108]." And, tellingly, § 41108(e) says that, "[b]efore an order under [§ 41108] becomes effective, it shall be submitted immediately to the President.

The President, within 10 days after receiving it, may disapprove it if the President finds that disapproval is required for reasons of national defense or foreign policy." It is obvious that, because suspensions of tariffs and revocations of clearances are extraordinary sanctions, Congress meant to treat them differently than other possible sanctions under the Act.

Notwithstanding the foregoing provisions of the Act, Mediterranean makes the extraordinary claim that the Commission is obligated to engage with the Secretary of State pursuant to § 41108(c)(2) *whenever* a carrier merely *alleges* that information or documents located in a foreign country cannot be produced because of the laws of that country. This would mean that President of the United States must then act to approve or disapprove any discovery order, regardless of whether the order involved the specific penalties under § 41108. This is not what the Shipping Act says. Mediterranean has taken words out of context to support a distorted interpretation of the statute. We therefore reject Mediterranean's entreaty that the Commission erred in failing to apply § 41108(c)(2) to resolve the discovery issue in this case.

The Shipping Act makes it clear that, without reference to any of the provisions in § 41108, the Commission has the clear authority to sanction carriers that fail to comply with a subpoena or discovery order. *See*, *e.g.*, *id.* § 41303(a) (broadly authorizing the Commission to subpoena witnesses and evidence in both investigations and adjudications, without referencing any foreign blocking statutes as exemptions or defenses); *id.* § 42104(d) (authorizing the Commission to issue specific penalties for failure to comply with discovery orders in connection with certain actions); *see also* 46 C.F.R.

§ 502.150(b)(3). Section 41108 does not modify this authority. Rather, § 41108, as its title and text indicate, is focused only on situations in which the Commission seeks to impose a unique sanction in the form of a suspension of tariffs or a revocation of a clearance required for a vessel operated by a carrier. If the Commission does not propose to use one of the unique sanctions authorized by § 41108, then the procedures of that section of the statute are not in play.

Mediterranean's reading of § 41108 is far from the best reading of the statute. *Loper Bright*, 603 U.S. at 400. Instead, it plainly contradicts the statutory text and defies basic common sense, as the Commission observed below. *See* Commission's Second Default Order 23, J.A. 479. Subsection (c)(2) refers to a carrier's "defense of its failure to comply with a subpoena or discovery order," but only with respect to cases in which the Commission has proposed tariff suspension or a revocation of a carrier's clearance, *see id.* § 41108(c)(1)(A)-(B). Mediterranean acknowledges that no such sanctions have been proposed here. Contrary to Mediterranean's contention, subsection (c)(2) does not exist in a vacuum: its meaning is necessarily informed by its neighbors. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) (interpreting the textual meaning of a statutory subsection in the context of the subsection preceding it); *Pereira v. Sessions*, 585 U.S. 198, 210 (2018) (looking to a "neighboring statutory provision" for "further contextual support" of a plain text analysis); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (drawing inference consistent with plain meaning from neighboring statutory provisions); *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 418-19 (2012) (same). The procedures in subsection (c)(2) are not in play because the sanctions in subsections (c)(1)(A) and (B) have not been applied.

The specific steps Congress requires the Commission to follow should it invoke procedures under § 41108 further bolster this point. As noted above, before the Commission may impose the penalties authorized in this section of the Act, it must first consult the President of the United States. 46 U.S.C. § 41108(e). This is not a requirement the Act imposes each time the Commission issues a discovery order. Rather, the Act broadly authorizes the Commission to request that the Attorney General seek enforcement of subpoenas and discovery orders in district court, *see id.* § 41308(a), and to broadly impose sanctions for "undue delay caused by a party . . . including issuing a decision adverse to the delaying party," *id.* § 41302(d), without any mention of the penalties and defenses outlined in § 41108(c); *see also id.* § 41303(a) (providing that the Commission may issue regulations outlining discovery procedures that conform with the federal rules of civil procedure, without referencing foreign blocking statutes or § 41108(c)); *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 758 (2002) (observing generally that "a party failing to obey discovery orders" in FMC proceedings "is subject to a variety of sanctions, including the entry of default judgment" (citing 46 C.F.R. § 502.210(a); FED. R. CIV. P. 37(b)(2))).

In this broader statutory context, it would be absurd to require the Commission to embroil the President and the Secretary of State in specific discovery disputes each time a carrier so much as "alleges" that a foreign blocking statute prevents discovery. Indeed, the proposition that Congress would bury such an onerous procedural requirement it intended to apply broadly in a unique statutory provision that is limited to "additional penalties" contradicts the basic understanding that "Congress . . . does not alter the fundamental details of a regulatory scheme in . . . ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Instead, Congress

normally employs clear and specific language when it wishes to abrogate a broader statutory regime. *See Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012). For example, Congress has made explicitly clear that several Shipping Act provisions apply "notwithstanding" other provisions in the Act or other laws. *See* 46 U.S.C. §§ 40703, 41104(b), 42105, 42303(c), 46107. Indeed, where it has chosen to not employ such language, it has explicitly justified its omission. *See id.* § 40705(b). It has included no such language here that would indicate its intent to override the Commission's general discovery procedure provided for in other sections of the Act.

Finally, even Mediterranean's own conduct throughout this litigation belies its contention that § 41108(c)(2) applies here. Mediterranean did not rely on this provision at the outset of discovery below, and instead originally argued that the Hague Convention was the only applicable process to address a foreign blocking statute. After the Swiss court rejected the Letter of Request, Mediterranean changed its tune. It has since argued that § 41108(c)(2)'s procedures constitute an alternative to the Hague Convention, but it says that either procedure suffices under the Act. This makes no sense because the procedures under § 41108 are mandatory when in force, as Mediterranean acknowledges, and nowhere does subsection (c)(2) discuss the Hague Convention. If subsection (c)(2) were to apply, it would not be optional. Under Mediterranean's interpretation, then, the Hague Convention itself would be rendered superfluous by § 41108(c)(2). There is nothing to indicate that this is what Congress intended when enacting these provisions. In any event, it does not matter because, as explained above, § 41108 has no play in this case.

On the basis of the clear terms of the statute, we conclude that the Commission did not act contrary to law when it

declined to follow procedures under § 41108 to address the discovery issue in this case.

### 3. The Commission's Decision to Issue a Default Judgment Was Not an Abuse of Discretion

The Shipping Act provides that the Commission may issue regulations outlining discovery procedures that conform with the Federal Rules of Civil Procedure. 46 U.S.C. § 41303(a). Pursuant to this authority, Commission regulations expressly state that an ALJ may issue an order "dismissing the action or proceeding or any party thereto, or rendering a decision by default against the disobedient party" for failure to comply with discovery orders. 46 C.F.R. § 502.150(b)(3). These regulations incorporate the Federal Rules of Civil Procedure to govern default orders. *See id.* § 502.12; FED. R. CIV. P. 37(b)(2)(A); *see also S.C. State Ports Auth.*, 535 U.S. at 758. In addition, the Act provides that the Commission may impose sanctions for delay, "including issuing a decision adverse to the delaying party." 46 U.S.C. § 41302(d). The Commission relied on both authorities for its default orders. Mediterranean does not meaningfully challenge its reliance on § 41302(d). Mediterranean has therefore forfeited any claim that this provision cannot justify the default judgment imposed here, and the sole issue before us is whether the Commission abused its discretion in doing so. *See Al-Tamimi*, 916 F.3d at 6 ("Mentioning an argument in the most skeletal way, leaving the court to do counsel's work . . . is tantamount to failing to raise it." (internal quotation marks and citation omitted)).

An order of default is generally reviewed for abuse of discretion, *Webb*, 146 F.3d at 971. However, we have held that a default judgment is only appropriate as a discovery sanction if "the litigant's misconduct is accompanied by willfulness, bad

faith, or fault." *Reliable Limousine*, 776 F.3d at 4 (internal quotation marks and citation omitted). And in determining the propriety of a default judgment, we consider three factors: (1) the prejudice to the other party, which must present its case without the ordered discovery; (2) the burden on the tribunal, which must spend its resources addressing delays caused by noncompliance with its orders; and (3) the need to deter bad faith conduct in the future. *Webb*, 146 F.3d at 971-75. Any one of these factors, alone, may justify a default judgment, but the judgment "must be based on findings supported by the record." *Id.* at 971.

Mediterranean claims that the default judgment against it constituted an abuse of discretion because the Commission did not properly justify its action or appropriately consider alternative sanctions. We disagree. We recognize, as did the Commission, that the issuance of a default judgment is unusual. *See* Commission's First Default Order 14, J.A. 327. The extreme nature of the sanction has militated against its careless use. In this case, however, the Commission considered the matter thoroughly and offered compelling reasons why a default judgment was justified here.

In the past, the Commission has dismissed complaints when a *complainant* failed to comply with discovery orders. *See Kawasaki Kisen Kaisha, Ltd v. Port Auth. of N.Y. & N.J.*, 2014 FMC LEXIS 36, at *14-18 (F.M.C. Nov. 20, 2014). It has also imposed sanctions such as the drawing of adverse inferences where a respondent refused to produce discovery, *see Jamteck Int'l Shipping, Inc*, 2009 FMC LEXIS 42, *6-7 (ALJ July 27, 2009). The Commission has never previously issued a default judgment when a respondent failed to comply with discovery orders. But it has certainly never abjured the possibility, especially not in a case like this one in which the Commission finds that all three *Webb* factors – prejudice to the

other party, burden on the tribunal, and the need to deter bad faith conduct in the future – are implicated. It appears that the Commission has never encountered a case like this before, one in which a respondent has been granted multiple opportunities to comply with the same discovery request, and where the party's response to the ALJ's and Commission's orders reflected a disregard for the agency's binding rulings. On this record, we hold that the Commission's interests in preserving the integrity of its procedures and in deterring similar dodging by the same or similar parties in the future justified the issuance of the default judgment.

The Commission affirmed the ALJ's initial default judgment as a discovery sanction. It did so in a thorough ten-page analysis, going through each of the three *Webb* factors as the ALJ had already done in the Initial Default Order. The Commission's decision is indeed compelling.

As to prejudice to MCS, the Commission found that Mediterranean's refusal to produce the requested discovery had stalled the litigation, precluding MCS from pursuing its claims. But more salient here is the harm to the Commission's adjudicative system. As the Commission explained, Mediterranean's refusal to comply with the ALJ's orders not only resulted in delays that "disrupted FMC business and burdened the FMC docket," but also "harm[ed] the FMC's adjudicatory system by undermining its authority." Commission's First Default Order 19-20, J.A. 332-33. The record amply supports this conclusion: Mediterranean repeatedly asserted grounds for not complying with the Commission's orders that the Commission had itself already rejected, including that the complaint did not state Shipping Act violations, that Hague procedures were required, and that it faced a material risk of criminal prosecution despite opinions

from Swiss authorities that made no practical evaluation of such risk.

The Commission also explained how Mediterranean's actions imposed undue burdens on the tribunal, causing the ALJ and the Commission to spend its resources addressing delays caused by Mediterranean's noncompliance with its orders. Indeed, Mediterranean's actions reflected a certain cavalier attitude with respect to applicable procedures and the law of the case when it routinely disagreed with binding orders and determinations. In its response to the Show Cause Order, for instance, it asserted that a default judgment would be an overreaction because Mediterranean has already "produced what it believes to be" all the relevant documentation in this case, despite the Commission's explicit findings that the additional discovery was central to MCS's claims and must be produced. Respondent's Response to Order to Show Cause 13, J.A. 227. Rather than answer the questions regarding whether the documents in question are located in Switzerland (which it has never done), Mediterranean refused to comply with discovery orders because it disagreed with the ALJ's rulings as to the viability of MCS's claims and the relevance of the discovery to those claims.

The lack of any attempt by Mediterranean to explain whether the documents in question are located in Switzerland rather than in the offices of its American subsidiaries, and to specify any steps Mediterranean had taken or could take to identify those documents allegedly located abroad, left the ALJ and the Commission with the impression that Mediterranean might be "refusing to provide the discovery because it disagrees with the findings related to the Commission's jurisdiction and the scope of these proceedings," rather than because the Swiss blocking statute truly prevented its compliance. Commission's First Default Order 20, J.A. 333.

But the ALJ's and the Commission's adjudicatory determinations as to these questions are not opinions for Mediterranean to take or leave, as it prefers. The ALJ had already determined that the Shipping Act claims here are viable; that the requested documents are relevant and must be produced; and that a party objecting because of foreign blocking statutes must demonstrate that the documents are located abroad and that it faces a genuine risk of criminal prosecution. Mediterranean can appeal these determinations, but it cannot simply disregard them or use them as grounds for disobeying additional Commission orders. *See Lever Bros. Co. v. United States*, 981 F.2d 1330, 1332 (D.C. Cir. 1993) (discussing the "law of the case" doctrine).

Against this record, it was reasonable for the Commission to find that Mediterranean's actions undermined the agency's authority, and that default judgment was the only appropriate sanction to deter similar stonewalling in the future. Mediterranean is a repeat player in adjudications and investigations by the Commission. Moreover, Congress has tasked the Commission with handling the regulation of overseas commerce, which necessarily involves the laws of foreign nations, including multiple foreign blocking statutes. As the Commission explained, "permitting FMC-regulated entities to subject ordinary FMC discovery proceedings about U.S. shipping activities to foreign control, and . . . disputes about international procedure, simply because a party asserts that unspecified information exists overseas, poses a significant threat to fair and timely resolution of cases before the Commission." Commission's First Default Order 22, J.A. 335.

Finally, the Commission adequately explained why lesser sanctions would not suffice: the discovery at issue here was so broad and central to MCS's case against Mediterranean that the

absence of discovery "significantly limited MCS's ability to make its case." *Id.* As a result, drawing adverse inferences against or foreclosing defenses to Mediterranean would not fully remedy the alleged harm to MCS and the disruption to the Commission's proceedings. Where Mediterranean had been warned of default judgment as a possibility should it not comply, the Commission reasoned, "[t]he failure of those warnings to produce any effect . . . supports our conclusion that only default is an adequate sanction here." *Id.* at 23, J.A. 336. This well-reasoned conclusion, especially in the context of Mediterranean's repeated disregard for binding Commission orders, did not constitute abuse of discretion on the Commission's part.

### III.   CONCLUSION

For the foregoing reasons, Mediterranean's petitions for review are denied.

*So ordered.*